WILLIAM B. LAWRENCE, Plaintiff, *v.* MORGAN COWPERTHWAIT, and Others, Defendants.

Supreme Court, New York County, January 9, 1934.

*John L. Wells,* for the plaintiff.

*Hill, Lockwood & Redfield,* for the defendants.

COLLINS, J. This senile litigation is of the vintage of 1904. Commenced thirty years ago, it is an egregious example of the law's delay. But the somnolent pace with which the case has crept is not attributable totally to the slow operation of legal procedure; the inertia of the litigants must share in the blame for the incredible lethargy.

Compared with this veteran of lawsuits, the thousands of two and three-year-old causes clamoring for disposition have not yet attained adolescence.

A recital of the proceedings exposes the expense and injustice of protraction and indites a blushing commentary on the processes of the law. The unhurried course of the suit is reminiscent of a chapter from Dickens or Washington Irving; it possesses some of the aspects of a Gilbert and Sullivan operetta; it has the appearance of a " believe it or not! " by Ripley.

The present motion concerns a referee's report filed about sixteen years ago. During the interregnum no action was taken regarding it.

The cause seeks to procure an accounting of plaintiff's interest in the copartnership of Cowperthwait & Co., which operated a furniture store in New York city, and of which the plaintiff was a member from February 1, 1898, until its dissolution on February 12, 1904.

The action began in July, 1904. Issue was joined in October, 1904. For the span of eight and a half years there was a surcease in the progress of the controversy. In 1909 the plaintiff became the son-in-law of the real defendant, Cowperthwait. On April 3, 1913, defendants moved to dismiss for lack of prosecution and, virtually simultaneously, plaintiff moved for judgment on the pleadings. On June 9, 1913, both motions were denied. On November 6, 1913, the case came on for trial and resulted in an interlocutory judgment for plaintiff and appointing a referee to take and state the account.

The hearings before the referee opened May 8, 1914, and closed February 14, 1918.

In the meantime (July, 1915) Cowperthwait had died, and the action continued and still continues against the executors of his estate. More, the plaintiff became his own attorney and represented himself at the hearings.

The referee handed down three opinions, the first on July 28, 1917, the second on October 16, 1917, and the third on April 28, 1918.

The referee found that on July 31, 1904, the plaintiff's interest in the firm of Cowperthwait was $17,136.55, on which the plaintiff was entitled to no interest, because the amount was unliquidated and required an accounting to ascertain and fix it. Defendants' counterclaim, on a claim assigned to it by Flint & Co. (formerly a Cowperthwait subsidiary), in the sum of $12,927.38 (including interest to July 31, 1904) was sustained and allowed, thus leaving a balance due the plaintiff from Cowperthwait of $4,209.17; but the referee concluded such balance would not bear interest until the

amount of such indebtedness should be determined by the court. Nothing was found due, nor is anything now claimed from, the other defendant, Critchley.

Following these reports, the case again lapsed into a state of comatose and thus remained for fifteen and a half years. Then, on June 16, 1933, arose a motion by the plaintiff to enter judgment as of April 28, 1918, in the sum of $4,209.17 and costs. On June 22, 1933, came another motion withdrawing the first notice of motion of June 16, 1933, and requesting " an order confirming said referee's report " and directing judgment in the same amount as prayed for in the original notice of motion. On July 10, 1933, a third notice of motion was served withdrawing the first two notices, and asking that the referee's report be confirmed to the extent of holding that the plaintiff's interest in the partnership was $17,136.55 on July 31, 1904, but rejecting that part of the report allowing the counterclaim of $12,927.38 and rejecting also the conclusion that the plaintiff was not entitled to interest. This notice requested judgment for $31,724.20 as of April 28, 1918, and interest, which would bring the plaintiff's claim to approximately $60,000.

On September 11, 1933, another notice was served, amending the third notice of July 10, 1933, and asking that the referee's report be confirmed as regards the finding that the plaintiff's interest in the partnership was $4,209.17 on July 31, 1904, and rejecting the report as regards the finding that the plaintiff was not entitled to interest. This notice asked that the clerk be directed to enter judgment as of April 18, 1918, for $7,697.13, with interest. This would make the plaintiff's judgment approximately $15,000.

Again, on October 23, 1933, another notice of motion was served amending the prayer of the notice of September 11, 1933. This last notice does not ask that the referee's report be confirmed, but prays for an order " amending the referee's report " so as to find that the plaintiff's interest on July 31, 1904, was $15,686.56 instead of $4,209.17, and rejecting the report in so far as it found that the plaintiff was not entitled to interest. It prays for an order directing entry of judgment as of April 22, 1918, for $28,588.67, with interest, together with costs and referee's and stenographer's fees. The total would be approximately $58,000.

Finally, in addition to the above-mentioned notices, a communication to the court directs attention to the case of *Funkhouser* v. *Preston Co.* (290 U. S. 158), recently decided by the United States Supreme Court, upholding the constitutionality of the 1927 amendment to section 480 of the Civil Practice Act, which allows interest on unliquidated, express or implied, contract claims " in every action now pending or hereafter brought " (261 N. Y. 140).

Obviously, the plaintiff was dissatisfied with the referee's report; the referee sued the plaintiff and recovered judgment against him for his services as referee, and subsequently the plaintiff paid the referee $1,731.46, also the stenographer's fees amounting to $625.06, making a total of $2,356.52. It is now sought to tax these items as disbursements.

About twelve pages of the minutes (containing 516 pages) and some of the exhibits are missing. The original minutes were not filed with the report, but a copy thereof has been submitted on the present motion. Nor, so far as the record shows, did the witnesses subscribe their names to their testimony.

Opposing the plaintiff's motion regarding the report, the defendants assert: (1) That the plaintiff's laches constitute an abandonment of the cause of action; (2) that even if there be no abandonment, the court, in the absence of all the minutes and exhibits, cannot pass upon the motion; (3) that the witnesses did not sign their testimony and the minutes were not filed with the report; (4) that the court is without power to amend the referee's report *nunc pro tunc;* (5) that even if such power existed, as interest does not accrue on plaintiff's unliquidated amount found due him until it has been liquidated by the judgment of this court, and since interest does run on the defendants' liquidated counterclaim, any order which the court would enter would result in a judgment in behalf of the defendants and against the plaintiff, and (6) that if the merits are inquired into it will be found that, irrespective of interest, the net result would be a judgment against the plaintiff, rather than one in his favor.

(1) That a plaintiff's laches may be so gross as to constitute an abandonment of the action and to preclude further proceedings therein finds support in reason and in illustration.

In *Bishop* v. *Fuller* (34 Misc. 813) an inquest was taken, but no judgment entered. After the lapse of fifteen years the plaintiff, having married since the inquest, moved for permission to continue the action in her married name. It was held that the action had been abandoned.

In *Hale* v. *Shannon* (58 App. Div. 247) it was sought to revive the action after ten years. Held, that the laches were so great as to foreclose revival.

In *James* v. *Shea* (28 Hun, 74) the cause of action was dismissed after thirteen years of inactivity. The court said: " There are in this district enough of live actions affecting the present affairs of litigants to afford abundant labor for the courts, without resurrecting cases which the plaintiffs have allowed to slumber in apparent death for nearly a generation of lives."

*Pringle* v. *Long Island Railroad Co.* (157 N. Y. 100) was begun in May, 1886. The plaintiff died in July, 1894. Administration letters were granted in October, 1897. Eight days thereafter leave was sought to continue the action in the name of the administrator. the defendant urged laches; plaintiff sought to excuse the delay. The Special Term denied the motion; the Appellate Division reversed upon the authority of *Holsman* v. *St. John* (90 N. Y. 461). The Court of Appeals, reversing the Appellate Division and reaffirming the doctrine of *Mason* v. *Sanford* (137 N. Y. 497), said: " ' The rule as to the revival of actions by the substitution of the representative of a deceased party in this state is as follows: In legal actions there is no mere time limitation, but the motion to revive may be denied for laches in making the motion. In equity actions there is a time limitation of ten years; but in such actions, on account of prejudicial laches, the court may refuse the reviver within the period of limitation.' "

To countenance the assertion of antiquated claims is hazardous, unjust and creates and encourages opportunities for fraud. This is attested by the Statute of Limitations. That statute recognizes that peace and security and the vicissitudes that beset life require that there be a limit of time to the propounding of claims. Even crimes may be outlawed. There comes a period when contention must cease. Here, the changes wrought by time would make it inequitable to permit the litigation to continue. The case is tainted with inexcusable laches. A judgment against the defendants, at the conclusion of the third decade since the origin of the case, would wreak irreparable injury upon the defendants. (*Kennedy* v. *Flynn*, 166 App. Div. 897.)

Cowperthwait died more than eighteen years ago and his estate has been distributed; his two residuary legatees are dead; the estate of one of them has been distributed and the estate of the other is represented to be insolvent. Twenty-four of the thirty years of the pendency of the case were dormant. Approval should not be granted to such torpidity.

The plaintiff's excuse for the extraordinary delay is that he deemed the report equivalent to a judgment. Indisputably, however, he did nothing whatever to enforce it.

(2) Although some of the minutes and exhibits are missing, an intelligent representation of their contents has been supplied.

(3) Former General Rule of Practice XXX (now rule 170 of the Rules of Civil Practice) required that the testimony of the witnesses be signed and that such testimony be filed with the referee's report. However, in *Matter of Hirsch* (116 App. Div. 367; affd., 188 N. Y. 584) it was held that if no objection was made to the omission to

sign testimony and the attention of the referee was not directed thereto, the signing by the witnesses would be deemed waived.

Commenting on an analogous rule, rule 129 of the Rules of Civil Practice (requiring witnesses to subscribe their testimony taken under section 288 of the Civil Practice Act), it was recently said, in *Broome County, etc., Assn.* v. *N. Y. State E. & G. Corp.* (239 App. Div. 304, 306, 307): " Substantial rights should not be sacrificed merely to do reverence to some technical rule * * * rule 129 may be construed as directory rather than mandatory, and a failure to comply with it constitutes simply an irregularity. The purpose of the act and of the rules is to secure the determination of issues upon their merits and to sweep away technicalities which may stand in the way of reaching the merits * * *.

" In the case at bar the failure to have the deposition read over and subscribed by the witness is merely an irregularity. The court below in the exercise of a sound discretion should not have suppressed this deposition. The ruling of the Special Term contributes little to the development of truth and still less to the furtherance of justice."

And since the minutes (or virtually all of them) are now before the court I do not regard the failure to have them accompany the report as fatal. I prefer to pursue a less orthodox course.

(4) The defendants' objection that the court is without power to amend the referee's report *nunc pro tunc* (*Wingrove* v. *German Savings Bank*, 2 App. Div. 479; *Ruland* v. *Tuthill*, 187 id. 314; *Guarantee Trust Co.* v. *Philadelphia, etc., Railroad Co.*, 160 N. Y. 1) has no application here, because modifying, revising, confirming or rejecting a referee's report does not constitute making an order *nunc pro tunc.*

(5) The harm of protracting litigation is tellingly illustrated by the respective contentions concerning interest.

As observed, the referee concluded that the plaintiff's share in Cowperthwait & Co. was $17,136.55, but that such sum bore no interest because " the amount of such indebtedness was then [July 31, 1904] unliquidated and could not be ascertained by computation from established data * * * and will not bear interest until the amount of such indebtedness shall be determined by the court." (Referee's conclusion of law IV.) He sustained the defendants' counterclaim, which, on January 1, 1904, amounted to $12,490.23, and allowed interest thereon, because it was liquidated.

Defendants maintain that " if a judgment is now entered it must compute the amount due on their counterclaim, viz., $12,490.23 with interest from January 1, 1904, approximately twenty-nine years, or 174%, making a total of principal and interest of $34,223.23,

and deduct from it the value of the plaintiff's interest, viz., $17,136.55, leaving a balance due defendants of $17,086.68." The defendants, however, "do not ask the court to do this." "We feel," they implore, "that the dead past should bury its dead." "All the defendants ask is to be let alone" is the plaintive way they put it.

Further, until 1927 no interest was recoverable on unliquidated claims. (*White* v. *Miller*, 78 N. Y. 393; *Blackwell* v. *Finlay*, 233 id. 361; *Faber* v. *City of New York*, 222 id. 255.) However, in that year an amendment to section 480 of the Civil Practice Act was enacted, which in part reads: "In every action now pending or hereafter brought wherein any sum of money shall be awarded by verdict, report or decision upon a cause of action for the enforcement of or based upon breach of performance of a contract, express or implied, other than a contract to marry, interest shall be recovered upon the principal sum whether theretofore liquidated or unliquidated and shall be added to and be a part of the total sum awarded."

It is this amendment which emboldens the plaintiff to ask for interest. (*Preston Co.* v. *Funkhouser, supra.*) The defendants counter that the amendment to section 480 of the Civil Practice Act is not applicable here, because the report had already been made at the time of its enactment.

Manifestly, it would not comport with justice to award the plaintiff interest under a law which was not in existence when the report was made, and regarding which report action could and should have been taken about nine years before the law became operative. To allow interest now, in an amount equivalent to or in excess of the principal, would be rewarding the plaintiff for his apathy and penalizing the defendants therefor. Congested court calendars condemn awarding premiums to dozing litigants. Whether the plaintiff, under a literal application of section 480, as amended, is entitled to interest, is not decided. For the reasons hereinafter assigned, it is deemed unnecessary to make the decision.

(6) Although some of the technical objections advanced by the defendants are valid, I have not been content to rest my final determination thereon. To avoid foreclosing the plaintiff by a strict and narrow application of procedural rules I have examined the entire record to ascertain whether the equities here are such as to compel the disregard of form for substance.

Two chief points were contested before the referee: *First*, whether the plaintiff was irrevocably bound by entries in the books of Cowperthwait & Co., and whether such entries were at variance with the written articles of copartnership. If the book entries prevailed, the plaintiff would be entitled to recover nothing; rather,

he would be a debtor of the defendants. The referee adopted the written agreement and found that it overrode conflicting book entries. The second litigated issue was the defendants' counterclaim of $12,490.23. As already observed, the referee sustained the counterclaim, but since the plaintiff now withdraws his objections to the referee's disposition, its merits will not be scrutinized.

There remains, then, the question of the correctness of the referee's finding regarding the subordination of the book entries to the written agreement, and the more fundamental question as to whether there is a clash between the books and the articles.

When, in February, 1898, the plaintiff and Cowperthwait and Critchley formed the copartnership, the plaintiff and the defendant Critchley were in the employ of Cowperthwait, as well as of Flint & Co. There were no written articles of agreement. Neither the plaintiff nor Critchley contributed any capital; their sole contributions were time and experience. The cash and other assets of the firm were contributed by Cowperthwait. The plaintiff and Critchley were each to draw ten per cent of the net profits as salary. Balance sheets were to be made up every six months and ten per cent of the net profits was to be credited to each of the three partners.

At the end of the first six months, or on August 1, 1898, the business showed a loss of $16,675.78. On February 1, 1899, there was neither loss nor profit. On August 1, 1899, there was a further loss of $13,401.28, making a total loss to date of $30,077.06. On February 11, 1900, a profit of $20,391.43 appeared.

It was then that a controversy arose concerning the disposition of the profit. Cowperthwait contended that the profit should be applied to offset losses; the plaintiff and Critchley insisted that the whole of the profit should be divided and each receive his share. Cowperthwait's views prevailed and the decision became unanimous that the profit of $20,391.43 should be applied in reduction of the $30,077.06 loss and that the remaining losses would be made up out of future profits before there should be any division of profits. The suggestion was made that the partnership agreement should be reduced to writing, whereupon articles of partnership were prepared by Cowperthwait's attorney and each signed on September 20, 1900, but the articles were dated February 1, 1898. In consideration for the concession by the plaintiff and Critchley, Cowperthwait agreed that the share of each of his partners should be increased from one-tenth to one-fifth of the profits.

Following the execution of the agreement the business of the firm continued. On August 1, 1900, it showed a loss of $15,005.55, but on February 1, 1901, there was a profit of $24,318.03, making a total profit up to that time of $44,709.46 and total losses of

$31,582.61, leaving a net profit of $13,126.85. This net profit was credited on the books to the partners, one-fifth to each. This system was continued from the beginning of the firm and no change was made in the books or in the methods of keeping the accounts. The plaintiff was in charge of the books. He employed the bookkeeper who kept them. The plaintiff had access to the books, examined them and discussed their contents. Every six months a balance sheet was made up; the plaintiff went over them. More, the plaintiff conferred with Cowperthwait about the books and frequently told him that they were properly kept and that the entries therein were correct. At no time did plaintiff object to any of the items in the books or make any claim that they were not kept in accordance with the written agreement.

The referee found that the book entries did not accord with the written partnership agreement, in that they deducted the losses prior to August 1, 1899, from the subsequent profits up to February 1, 1901 and credited plaintiff only with one-fifth of the net profits of the entire three years after deducting such losses. According to the books the plaintiff, at the time of the dissolution, owed the firm $4,135.19.

Seemingly, the ultimate conclusion of the referee does not square with those findings which constitute his premise. The following findings of fact may be regarded as forming the premise:

" 26. The said balance sheets were made up by the said Critchley and copies thereof were delivered by him to the plaintiff Lawrence, who examined them at the end of each six months period respectively.

" 27. The books of the firm were kept by a bookkeeper who was employed by the firm and who was under the supervision of the plaintiff and who had been engaged by the plaintiff; and said books were at all times accessible to the plaintiff and were many times examined by him.

" 28. During the continuance of the said firm the plaintiff Lawrence had actual knowledge of the contents of the firm's books, and particularly of the entries therein showing the application of the profits to the discharge of previous losses and the amounts credited or debited to, his personal account.

" 29. During all of said period the plaintiff Lawrence was thoroughly familiar with the principles and methods of practical bookkeeping.

" 30. From the time of the said oral conversations and agreements of February, 1900, and thereafter during the continuance of the firm, and until after the dissolution of the firm on February 12, 1904, the plaintiff Lawrence never made any objections to his co-partners as to the correctness of the balance sheets or as to the

amount of the profits or as to any items charged or credited to his personal account on the books of the firm; but after the dissolution of the firm on February 12, 1904, and before July 31st, 1904, and at or about the time of the commencement of this action, and by the commencement of this action on July 30, 1904, the plaintiff Lawrence did make objections to the correctness of his said individual account with the firm as shown on the firm's books, and to the correctness of such balance sheets."

Nevertheless the referee found:

" 31. From the time of the said conversations and agreements of February, 1900, and thereafter during the continuance of the firm, and prior to the commencement of this action on July 30, 1904, the plaintiff Lawrence did not in any way express to the said Cowperthwait his approval of or consent or agreement to any of the said items entered on his said individual account with the firm or appearing on the said balance sheets.

" 32. The plaintiff Lawrence did not, by his silence with reference to the items entered on his said individual account with the firm and appearing on the balance sheets, actually express his approval thereof or his consent or agreement thereto."

The referee's painstaking opinion summarizes the plaintiff's conduct thus: " I find that the silence of Lawrence, as to such first item, continued during the entire three years and more thereafter and until after dissolution of the firm on February 12, 1904, although Lawrence had full and complete knowledge and understanding of such item from the time it was entered on his account on or about January 31, 1901." The referee, however, preferred to adopt the rule that the book entries, and the plaintiff's knowledge thereof and silence thereon, constituted only *prima facie* or presumptive evidence of his assent (*Taylor* v. *Herring*, 23 N. Y. Super. Ct. 447; *Cheever* v. *Lamar*, 19 Hun, 130; *Cronk* v. *Crandall*, 137 App. Div. 440; *Dwyer* v. *Rorke*, 10 id. 236; *Donovan* v. *Clark*, 138 N. Y. 651; *Hughes* v. *Smither*, 23 App. Div. 590), and rejected the authorities that the entries in the partnership books, standing a reasonable time without objection, constitute a contract and are conclusive. (*Snyder* v. *Seaman*, 2 App. Div. 258.) He embraced the revised theory that words speak louder than actions.

Even though the presumptive, as against the conclusive, evidence rule be more in consonance with justice, the facts here are so overwhelming in favor of the contention that the book entries reflect the authentic intention of the parties, that the plaintiff should be held bound thereby. Cogent support for this conclusion appears on page 12 of the referee's opinion. There he significantly states: " The presumption, created by the silence of Lawrence after the

entry of the first item in his account, that the written agreement thereby was, or theretofore had been, modified to correspond with such entry, is re-enforced by the facts that Lawrence thoroughly understood such entry and the data from which, and the methods by which, that first item was computed; that he made no objection thereto, nor to the semi-annual balance sheets prepared and submitted to him, in the regular course of the partnership business, during the three years and more, of his continuance in the partnership after the entry of that item; *and he does not, by any oral testimony explain away his failure to object.*" (Court's italics.)

But reliance need not be placed solely on the plaintiff's tacit acquiescence in what the books record. Estoppel is not the only pillar which sustains the defendants' position. Excavating to the very foundation of the plaintiff's claim — the articles of copartnership — I am constrained to differ with the referee's construction of those articles.

I am impressed by Cowperthwait's interpretation of paragraph " third " of the articles, which says, in effect, that " after providing for the debts and liabilities of said copartnership * * * one-fifth of the net profits shall be credited to each of the parties * * *. They shall bear only such share of the losses as the ratio of what they have paid bears to the capital actually in the business at that time." Cowperthwait testified that the partners had construed the word " net " to cover the accumulation of losses; that " the losses would come out before the profits were divided. That is the way we understood it." He construed the contested clause to mean " that there would be no profits until losses had been paid * * *. If the business was conducted entirely at a loss neither Critchley nor Lawrence were to be asked to put their hands in their pocket and pay out anything * * * all their risk was their time."

Cowperthwait's construction appears more robust than the plaintiff's insistence that no part of the losses accruing in the early days of the partnership should have been charged to him because nothing had then been contributed by him. Plaintiff urges that when on February 1, 1900, a gross profit arose, one-fifth of it should have been credited to him without deduction of any previous losses. I concur in the defendants' contention that the plaintiff's construction supersedes the phrase in the writing to the effect that the profits were to be credited only " after providing for the debts and liabilities of the copartnership."

Construing paragraph " third " of the written agreement in the light of the conduct of the parties respecting their prior transactions, I am convinced that the book entries should be accepted as repre-

senting the true intention of the parties. (*Gillet* v. *Bank of America,* 160 N. Y. 549; Story Part. [Gray's ed.] §§ 191, 192; *Woolsey* v. *Funke,* 121 N. Y. 87.) " Indeed, the great object, and practically the only foundation of rules for the construction of contracts is to arrive at the intention of the parties." (*Gillet* v. *Bank of America, supra,* 555.) " There is no surer way to find out what parties meant, than to see what they have done." (*Insurance Company* v. *Dutcher,* 95 U. S. 269, 273.)

Predicated upon (a) a practical and reasonable interpretation of the disputed clause; (b) the positive and tacit conduct of the parties before and after the signing of the articles; (c) the partnership books; and (d) a complete survey of the panorama, I deduce that nothing is due the plaintiff from the defendants.

This deduction, reinforced by the other factors hereinabove discussed, leads to the finality that the time has arrived to rid the court of this stale litigation. All parties have been dilatory. The motion as to the referee's report is, in all respects, denied. But negative action will not end the case. Apart from section 161 of the Civil Practice Act (*Raber* v. *Schweitzer,* 214 App. Div. 759; *Armstrong* v. *Rickard,* 226 id. 371; *United States* v. *Edison El. Ill. Co.,* 37 F. [2d] 926; *Cooper* v. *Martin,* 222 App. Div. 765), the court has power to dismiss a cause for neglect to prosecute.

It is the " privilege and duty " of the Supreme Court " to mould and expand its processes so as to afford protection to the rights of all citizens." (*Davis* v. *Zimmerman,* 91 Hun, 489.) " Every court has inherent power to do all things reasonably necessary for the administration of justice within the scope of its jurisdiction." (*Matter of Bar Association of City of N. Y.,* 222 App. Div. 580, 587.)

Complaint dismissed. Order signed.