OPINION OF THE COURT
Edward J. Greenfield, J.
On this motion, defendant directly challenges the power of the Administrative Judge of this court to assign a single *228 Judge of the court to hear and supervise all aspects of this and several related actions from the pretrial stages on which cases have been designated as appropriate for "complex litigation” treatment. He also asks for the right to take the depositions of the Administrative Judge, the general clerk of the court, and other persons who assisted or advised the Administrative Judge in his determination. The motion thus raises policy and procedural questions of prime importance concerning the powers of this court to deal with its own calendars.
There are 15 actions in all which are involved, affecting 9 parties, with damages claimed approaching $500,000,000. Nine of the actions had previously been ordered to be heard jointly by a Special Referee who would supervise joint examinations before trial. However, this procedure as well was challenged by defendant, who had charged "misconduct” by the Referee. Up to this point, motions relating to various aspects of these actions have been decided by 12 different Justices of the Supreme Court, and several other motions are pending or imminent. The attorneys for Bankers Trust Company made application by letter to the Administrative Judge for the assignment of a single Judge to hear all interlocutory applications and to preside at trial, rather than have portions of the matter heard by many separate Judges. This application was joined in by Clarence Rainess & Co., a defendant in one action and a third-party defendant in six other actions, and was opposed by defendant Braten, and by the attorney for certain other parties. The application eventuated in the order by Mr. Justice Dudley "after review of the special circumstances” and "in accordance with procedures to expeditiously resolve all pending and future pre-trial applications”, pursuant to which all the cases were assigned to a single Justice "for all purposes”.
The objecting attorneys base their opposition on the absence of any statute or promulgated rule explicitly authorizing the assignment of a case to a single Judge prior to trial for all purposes, and upon the claimed denial of due process in having the question of assignment handled administratively, rather than by a formal litigated motion in Special Term, upon notice, with sworn affidavits, full rights to discovery, a fact hearing and oral argument upon the law. They also claim denial of due process in that their case was singled out for special treatment, and not handled in the same way as the *229 bulk of other cases. This court finds these objections to be without merit.
The history of these cases illustrate how a straightforward issue can burgeon into the luxuriant growth of complex litigation under the green thumb of lawyers intent on expanding and multiplying the proliferation of issues, rather than narrowing, simplifying and focusing issues for ready resolution. It is precisely such a situation which calls for a strong hand in control, to prevent the litigating urge from metastasizing and running rampant, while assuring that the real issues and rights of the parties are fully protected. Charles Dickens to the contrary, the law these days is not quite so much an ass as some lawyers would make it. Given the powers which courts can exercise today, powers here under challenge, cases like Dickens’ fictional Jarndyce v Jarndyce, which dragged on interminably and nourished generations of lawyers, are the exceptions and not the rule.
The genesis of the dispute between the parties was simple enough. Bankers Trust Company had been lending moneys to Braten Apparel Corporation pursuant to a written agreement which gave it a lien on the borrower’s accounts receivable and other collateral. The corporation’s obligations were personally guaranteed by Milton Braten, Erwin L. Klineman and Emery E. Klineman. On September 5, 1974, alleging inability to pay its debts as they matured, the corporation filed a petition under chapter 11 of the Bankruptcy Act in the United States District Court for the Southern District of New York. The bank claimed to be a secured creditor for $4,600,000. The debtor contended the bank’s lien was invalid, but the Bankruptcy Court ruled otherwise, and directed liquidation of the collateral, an accounting, and the ascertainment of any deficiency over what was realized on the security.
The filing of the chapter 11 petition was followed by a veritable barrage of lawsuits. First, Bankers Trust served Braten and the Klinemans in the Supreme Court, New York County on their individual guarantees. Instead of interposing an answer and counterclaim, each individual in turn brought a separate action against the bank (one in the Supreme Court, New York County, two in the Supreme Court, Westchester County), alleging the bank had breached its agreement to extend further advances to the corporation. Then the corporation also commenced a similar action in the Supreme Court, New York County, against the bank, claiming $25,000,000 in *230 damages. It brought a similar action against the bank in the Supreme Court, New York County, two months later. Braten then brought an action in Civil Court, New York for alleged excess and usurious interest, and for usurious interest and for conversion. The corporation also sued Clarence Rainess & Co., its accounting firm, claiming the accountants had falsely informed the bank that the corporation was insolvent, causing the bank to cut off further advances. The bank, in turn, has asserted a claim against the accountants as a third-party plaintiff, alleging it terminated advances to the corporation on the basis of their representations. Another action was brought against the bank by a group of affiliated companies claiming a failure to return Braten Apparel Corporation checks payable to them, and also claiming a failure by the bank to extend financial accommodations to them as had been done previously for Braten Apparel Corporation. Then Braten Apparel Corporation in May of 1977 brought three more suits against the bank in the Supreme Court, New York County, for $100,000,000; $35,000,000 and $10,000,000, respectively, alleging among other things that the corporation relying on the bank’s statements that it was insolvent, filed the chapter 11 petition to its deteriment.
The corporation also started a suit against the bank in South Carolina for $95,000,000 on the same transactions as those involved in the New York actions. The bank thereupon instituted a new suit in New York, asking that the defendants be enjoined from proceeding with this South Carolina action.
Of the 15 actions, the first 9 were consolidated for joint trial and motions were made to dismiss some of the later actions as duplicative. While this and the question of further consolidation had not yet been decided, a Special Referee was designated to supervise joint discovery proceedings and the examinations before trial. The bank, through its officers and employees, was examined over the course of a year at 50 separate sessions, and a transcript of over 10,000 pages was complied. When the Braten group indicated a desire to examine 70 more witnesses, the Special Referee ruled that all of the principal bank witnesses had been heard, and that it was time for the bank to go ahead and examine. At that point the defendants challenged the Referee’s ruling and sought to remove him.
It was at this juncture that the bank addressed a letter to the Administrative Justice reciting the facts, summarizing all the causes of action, pointing out that 12 separate Judges had *231 already passed on various aspects of the litigation and many other motions were pending and anticipated, and requesting that a single Justice be assigned for all interlocutory applications, and to preside at the trial.
The Administrative Justice on March 8, 1978 issued an order reciting that "after review of the special circumstances * * * and in accordance with procedures to expeditiously resolve all pending and future pre-trial applications”, he was, pursuant to the authority conferred upon him, assigning all 15 listed cases for all purposes to the Justice presiding in Trial Term, Part 23, one of the parts specially designated to handle the trial of complex and protracted litigation. It is this order which is challenged on the instant application.
Defendants immediately moved by order to show cause to vacate the order of the Administrative Justice on the ground that it had been granted without a hearing in violation of due process in a "summary, mysterious way”, and asking for discovery, deposition and disclosure about the evolution of "the amazing March 8, 1978 order.” The motion was returnable in Special Term, Part I, where it came on to be heard before me. Rather than having the motion referred to the Administrative Judge whose order was sought to be revoked, upon disclosure that I was a member of the committee which recommended the single Judge assignment to him, all parties agreed that I could decide the motion without the necessity of referral.
This appears to be the very first time that the right of the Administrative Judge to assign a case to a single Justice both for trial and pretrial supervision has been challenged. Accordingly, it is appropriate to set forth the procedures which are currently being followed before undertaking an analysis of their legality. At the least it will be demonstrated that the process is neither "summary” nor "mysterious”.
Any attorney, at any stage of a case or group of cases, may direct the attention of the court to the fact that the case is of such a nature, by reason of size, complexity, multiplicity of parties, or burdensome and potentially duplicative motion practice as to warrant assignment to a single Judge from its pretrial stages onward. This can be done by a simple letter calling attention to the facts, and if he agrees, the Administrative Judge will assign a single Judge, or the court may act sua sponte through one or more Judges involved in earlier stages calling the problem to the attention of the Administrative *232 Judge. Only the Administrative Judge, and not any single Justice sitting in Special or Trial Term, has an over-all view of the needs and requirements of the whole court, and the relative availability of individual Justices to make the necessary decision on assignment.
For a number of years, with the exception of certain specialized parts, this court operated on the basis of individual calendar (IC) parts, with all cases being assigned to particular Judges from the very outset for all purposes. Unlike the system prevalent in the Federal courts of this circuit, the sheer volume of cases in this court made a pure IC system unworkable, because no IC Judge could possibly become intimately familiar with the thousands of cases which would be his aliquot share, and the huge number of motions continuously pouring in made it difficult for the Judge properly to carry out his trial, conferencing, and motion duties. But note that at that time virtually every case was assigned to a single Judge from the outset for all motion and trial purposes.
After a period of time in which a pure IC system proved difficult and unworkable, the system was modified so that cases were assigned to individual calendar parts only after a note of issue had been filed. (See Rules of Appellate Division, First Department, 22 NYCRR 636.2.) That transferred most motions relating to discovery and the early stages of litigation back to whichever Judge was sitting in Special Term, Part I, in a given week. Sometimes, therefore, several different Judges would pass on motions in a particular case in its pretrial stages. At other times, one or both of the parties might request that subsequent or related motions in a case be referred to the Justice who had previously become familiar with the case.
In those instances in which numerous motions were made and many different Judges had to become familiar with the quirks, the history, and the complexity of the case ab initio, the duplication of effort was enormous, and the results, sometimes in conflict, not always satisfactory. Again, in separate but related cases, and in multiparty litigations, something had to be done to avoid endless and repetitive discovery on the same or similar matters, and a comprehensive schedule worked out so that the cases would not proceed haphazardly, and drag on endlessly. Thus was evolved the system of assigning a single Judge, not on the basis of a contested motion, but on a simple request, by an attorney or by a Judge in a given *233 case, for an administrative direction, that the matter be accorded comprehensive and unified handling from an early stage, just as all cases had been handled under the early IC system.
Up to now, no one has ever claimed a due process right not to be assigned to a particular Judge unless there was an application for disqualification based on bias, prejudice or partiality. Assignment of a case to a particular Judge and the stage at which it is done have always been regarded as matters of judicial administration, and not the stuff of adversary litigation.
The present practice, when a suggestion (not a motion) is made for an assignment of a single Judge, is for the Administrative Judge to consult with his administrative committee on complex cases (composed of Judges fully familiar with the handling of complex cases) for their recommendation. This is made after a review of the nature of the case, the multiplicity of motions which might be engendered, the pleadings, the papers already on file in the case, and the desirability of unitary supervision. The pros and cons are weighed, and a recommendation for "complex case treatment” is made balancing the needs of a particular case against the availability of court time and personnel. The recommendation is made to the Administrative Judge and it is discussed with him in terms of the need of the court, and not whether the assignment will benefit one side or the other in the litigation. Thus, no necessity was perceived for a full-blown adversarial hearing, with each party presenting its own contentions based purely on self-interest and supposed tactical advantage.
It should be noted that in addition to the methods of assignment previously mentioned, the Administrative Judge may assign a case to a particular protracted trial part at any stage when it appears an unduly long trial would tie up other., parts — again as an administrative determination without the** benefit or necessity of an adversarial hearing; or the Justice presiding in a conference and assignment part may assign any particular case to a back-up trial part; or on the criminal side Conference Judges in GTC parts assign cases to GT trial parts. The Appellate Division may assign a particular class of cases to an individual Judge (e.g., nursing home cases; corruption of justice cases, etc.). This too is purely an administrative, and not a litigative determination. Individual parties are not solicited for their views.
*234 It is the contention of the defendants, apart from their claimed denial of due process, that in the absence of some statute or rule expressly conferring power on the court’s Administrative Judge, he totally lacks the power to act unilaterally in designating a single all-purpose Judge. Defendants argue that whatever the power of the courts previously may have been, it has all been changed by the adoption of the State-wide unified court system, and the statutory designation of the State-wide Administrator. They argue that all administrative power having been reposed in him by statute, his deputies can act only through statutory authorization or the promulgation of explicit rules and standards governing each exercise of power.
Sections 210 to 215 of the Judiciary Law (L 1978, ch 156) provide for the designation of Administrative Judges, their duties and the way in which they are to be carried out. Section 211 of the Judiciary Law calls for the Chief Judge, after consultation with the Administrative Board (the Chief Judge and the Presiding Justices of the Appellate Division), to promulgate general standards and policies for the court system including "the dispatch of judicial business”. No such rule has yet been adopted, but that surely does not mean no judicial business may be dispatched until the adoption of such rules. Section 212 (subd 1, par [d]) of the Judiciary Law delineates the duties of the Chief Administrator of the courts and empowers him to designate Deputy Administrators and Administrative Judges. He, or presumably his designated deputies, may assign Judges to parts and make necessary rules therefor. (Judiciary Law, § 212, subd 1, par [c].) Traditionally, such assignments and governing rules are handled by the local Administrative Judges.
By an administrative order dated April 18, 1974, Mr. Justice Edward R. Dudley was designated as Assistant Administrative Judge to supervise the activities of the New York County Supreme Court, Civil Division, "in accordance with the standards and policies” of the New York City Administrative Judge and the Administrative Board of the Judicial Conference. Indisputably, no rules, regulations or guidelines have ever been issued as to the designation of a single all-purpose Judge for a particular case. Hence, defendants maintain, Justice Dudley, in making such a designation, was acting not in excess of hi& authority, but entirely without authority. I reject entirely the notion that the absence of an explicit *235 authorization means the Administrative Judge is thereby rendered powerless to deal with court business as it arises on a day-to-day basis.
The Supreme Court of the State of New York bears that proud name because, unlike courts of limited jurisdiction (Surrogate’s Court, Civil Court, Family Court), and unlike the Court of Appeals which reviews claimed errors of law, but may exercise only those powers expressly conferred by Constitution and statute (see Cohen, The Powers of the New York Court of Appeals [1934 ed]), it is a court of unlimited original jurisdiction, exercising all the powers of a court of law and equity, limited only by the exceptions of the Constitution and statutes. It has the ability to fashion whatever remedies are required for the resolution of justiciable disputes and the protection of the rights of citizens. (Lawrence v Cowperthwait, 150 Misc 326, 337, citing Davis v Zimmerman, 91 Hun 489.) As a court of such untrammeled powers it may, subject to appellate review, invoke its inherent authority to deal with the cases before it in any appropriate manner, even in the absence of any direct grant of legislative or administrative power. (Langan v First Trust & Deposit Co., 270 App Div 700, affd 296 NY 1014; Hovey v Elliott, 145 NY 126, 138; De Lancey v Piepgras, 141 NY 88, 96; Walker v Walker, 82 NY 260, 264; Brinkley v Brinkley, 47 NY 40.) The Supreme Court is not a dependent or subservient court. It can tailor the remedy to suit the problem, and certainly needs no express grant of power to deal with its own business and to control its own calendars.
"Inherent powers consist of all powers reasonably required to enable a court to perform efficiently its judicial functions, to protect its dignity, independence and integrity, and to make its lawful actions effective. These powers are inherent in the sense that they exist because the court exists; the court is, therefore it has the powers reasonably required to act as an efficient court.” (Carrigan, Inherent Powers of the Courts, p 2, published by Nat Coll of State Judiciary, 1973; see Matter of Association of Bar of City of N. Y., 222 App Div 580, 587.)
To suggest that no power exists in the Supreme Court to handle special cases in special ways because of the omission of all conceivable delegated powers is tantamount to calling for trains to run without wheels and armies to march without shoes. "Every court has inherent power to do all the things that are reasonably necessary for the administration of justice *236 within the scope of its jurisdiction.” (14 Am Jur, Courts, § 171; 21 CJS, Courts, § 14.) The inherent rights of the court are not dependent upon the express grant of power. (Board of Comrs. of Vigo County v Stout, 136 Ind 53, 62; Smith v Gallagher, 408 Pa 551; see, also, Langan v First Trust & Deposit Co., supra; Hovey v Elliott, supra; De Lancey v Piepgras, supra; Walker v Walker, supra; Brinkley v Brinkley, supra.)
The statutory changes which created the unified court system and centralized administration were intended to strengthen the position of the courts, and not, by calling for procedural standards, designed to paralyze them. Any self-respecting court will refuse to declare itself helpless in the face of problems not dealt with by existing rules.
Indeed, the Judiciary Law, a specific legislative enactment, recognizes and encourages judicial resourcefulness in crafting appropriate remedies in the absence of express authority (cf. CPLR 3103, 5240). Subdivision 3 of section 2-b of the Judiciary Law provides:
"A court of record [defined to include the Supreme Court] has power * * *
"3. to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it.”
Well, defendants concede, even in the absence of express authority, courts do have inherent power to deal with scheduling court sessions, adjourning cases, deciding what shall be argued and what submitted on papers, which cases shall be consolidated, which trials can be bifurcated, and can do so without publishing the governing standards and guidelines, purely as a matter of judicial discretion — but those are powers which inhere only in Judges. An administrator, however, they urge, even though he be a Judge, is not exercising judicial power but administrative authority. As such, goes the contention, his powers are limited only to those expressly conferred upon him. The Trial Judge may have broad inherent powers but the Administrative Judge has none.
Such specious distinctions must be rejected out of hand. The Administrative Judge is the direct successor to the President of the Board of Justices, who was chosen by his colleagues to act for them in an administrative capacity. No court in the land can function on a pure diet of adjudication. There can be no adjudication without administration. There must still be someone who will deal with personnel, assignments, new *237 approaches to new problems, case distribution, and the like. The fact that his appointment now derives from a centralized administration rather than from his colleagues does not strip him naked of his powers to help the court function efficiently and effectively. He is still a Justice of this court, and not some clerical functionary who cannot move until given the order.
Inherent power is not limited to the exercise of purely judicial functions. Quite to the contrary. The inherent power of the court is nonadjudicatory. It does not deal with justiciable matters. It relates to the administration of the business of the court. (Wayne Circuit Judges v Wayne County, 386 Mich 1.)
It is because of the fact that the order here challenged is an administrative order, rather than an adjudicatory order, that it does not come about through formal motions, with its panoply of notices, affidavits, exhibits, briefs, and oral argument by all parties. The determination is how the case shall be handled by the court, not how it shall be decided. In the promulgation of such an order there is no reference to the fact-finding and law-concluding functions of the court, hence no need for factual affidavits or adversarial argument, unless the court chooses to call for further clarification. The decision is based on the file, the nature of the case, and the history of the litigation.
Defendants, prior to the making of such an administrative decision, would seek the right of discovery, the taking of depositions of the Administrative Judge and of the court clerks, testimony under oath, exhibits, arguments and memoranda. To permit it would paralyze the administrative process, and give us a miniature trial before the pretrial which precedes the trial. The fact is that the very making of this motion to vacate the administrative order has afforded defendants the adversary hearing they desired, and a full opportunity to be heard. Nothing presented persuades this court that the assignment of all cases to a single supervising Judge was improper. Indeed, the necessity for such an order has become even more apparent.
Counsel for the moving defendants was hard put to reply when ásked by the court how they were aggrieved. Surely they have no due process claim to delay and confusion. They have no basic right to be assigned to one Judge rather than another. They claim their cases are not being treated the same as other cases on the calendar, but the very nature of *238 these cases, and their proliferation into the swollen monster they now are, necessitate the special treatment they will receive. Such a special assignment is not a penalty. Indeed, many litigants would consider it a privilege.
In Goldblatt v Merrell Co. (22 AD2d 886), the Appellate Division of this department observed: "The orderly administration of justice requires that a single Justice of the Supreme Court be given jurisdiction over and supervise and preside over all phases of all such actions”.
What they directed on appeal then has since been done by this court as a matter of course in these and other actions of greater and lesser complexity. No valid basis has been presented for a revocation of the court’s prior order. The motion to vacate must be denied in all respects. The parties should now proceed to a prompt resolution of the lawsuits.
No need exists for any order to be settled.