In the Matter of AT&T INFORMATION SYSTEMS, INC., Appellant, v WILLIAM J. DONOHUE, as Commissioner of Commerce of the State of New York, et al., Respondents.

Third Department, December 19, 1985

### APPEARANCES OF COUNSEL

*DeGraff, Foy, Conway, Holt-Harris & Mealey* and *Burns Summit Robins & Feldesman (Stuart A. Summit* of counsel), for appellant.

*Robert Abrams, Attorney-General (Wayne L. Benjamin* and *William J. Kogan* of counsel), for respondents.

### OPINION OF THE COURT

Main, J.

During 1968, at a time when there was a general business decline and unemployment was rising in the State, the Legislature passed and the Governor signed into law Commerce Law former article 4-A, which brought into being the New York State Job Incentive Board (Board) (L 1968, ch 1054). Its purpose was to help "alleviate chronic unemployment", and the tax incentives provided by it were "designed to encourage private capital to undertake job training and to locate, expand, and improve facilities in our urban areas, thereby enhancing the productivity of workers who would otherwise be unemployed or underemployed" (Governor's memorandum, 1968 NY Legis Ann, at 494). In brief, its purpose was to offer tax incentives to eligible businesses and industries in exchange for enhanced employment opportunities. It is the Board's denial of petitioner's application to participate in this program that gives rise to this appeal.

Up until 1969, petitioner's parent company, American Telephone and Telegraph Company (AT&T), and its operating subsidiaries, provided regulated common carrier telecommunication services (e.g., telephone services), as well as the equipment necessary to provide those services, to subscribers. These carriers were regulated at both the Federal and State levels, and any competition for such business was legally foreclosed. However, in 1969, the Federal Communications Commission (FCC) ruled that telephone equipment not supplied by AT&T

could be connected to the AT&T system,[1] thus encouraging the competitive sale of such equipment. In 1980, the FCC, in extending this competitive environment, ordered that new terminal equipment and enhanced information services may be furnished on an unregulated, competitive basis. The FCC also determined that, if AT&T wished to compete in these areas, it would have to do so through the formation of a completely new and different subsidiary which was separate both physically and functionally from the parent and its affiliates, and that the new entity must be formed by no later than January 1, 1983.[2] In 1982, well within the prescribed time limit, AT&T, because of its desire to participate in the competitive sale of equipment and information services, formed petitioner, originally called American Bell, Inc. but subsequently designated AT&T Information Systems, Inc., as an entirely new subsidiary in order to pursue that objective.

In creating petitioner, AT&T was aware of the obligations and benefits of Commerce Law former article 4-A and made application to the Board for several of petitioner's facilities. Receipt of the applications was acknowledged and the Board advised that, while the information submitted was not yet complete, based upon that information, the facilities appeared to be eligible. One of the facilities, an advanced communications service technical center, was able to promptly submit the required information and, having been found to have complied, was approved. By reason of being in the formative stage, the other applying facilities did not have the requested information readily available but continued to acquire such information for presentation.

Meanwhile, in early 1983, Commerce Law former article 4-A came under rather intense attack by the media and others. The Legislature and the executive branch responded by abolishing the Board (L 1983, ch 15) and transferring its responsibilities for monitoring of corporate franchise tax credits and real property tax exemptions of previously certified units to the Department of Taxation and Finance and the State Board of Equalization and Assessment. However, the Board was to continue its normal functions until June 30, 1983. In early April of that year, AT&T was advised of the probable elimina-

---

1. *Carterfone* FCC decision.

2. Apart and separate from the FCC orders, divestiture was ordered after stipulation in an antitrust suit *(United States v American Tel. & Tel. Co.,* 552 F Supp 131, *affd sub nom. Maryland v United States,* 460 US 1001). Divestiture was completed by January 1, 1984.

tion of the Board effective June 30. In early May, AT&T submitted revised applications and the supplemental information for some 13 new facilities. The Board's last meeting was held on June 27, 1983, and petitioner's representative appeared to answer questions and furnish any additional relevant information. On the same day, respondent Commissioner of Commerce, who was also Chairman of the Board, signed a letter addressed to petitioner in which he advised that all 13 applications were denied because the available "information did not demonstrate that the projects were in fact creating net new jobs for New York State". Petitioner commenced this proceeding requesting that the Board's determination be overturned, contending that it had failed to perform a duty enjoined by law, i.e., to make an independent judgment instead of passing that responsibility to the courts, had erred as a matter of law in applying an impermissible standard, and had acted arbitrarily and capriciously. Special Term, in a brief decision, seemingly adopted the standard considered by the Board and, though referring to certain events as possibly having affected the decision, nonetheless dismissed the petition, thus giving rise to this appeal.

It has been long and well established that, because of the severe limitations upon judicial review of determinations by administrative bodies, those administrative agencies should be ever mindful of the heavy responsibility thereby imposed, and that this responsibility should dictate conscientious and painstaking assessment of the evidence presented (*Matter of Weekes v O'Connell*, 304 NY 259). Clearly, no such assessment was made here. At the opening of the final Board meeting on June 27, 1983, it became readily apparent from the remarks of the counsel to a State Senator that the Board, the majority of whom held cabinet posts, had been invited and encouraged by persons of influence in State Government to adopt a different attitude and approach when considering applications of this kind. That this had an effect on the Chairman and, most likely, other members of the Board, is evidenced by the Chairman's comment at the final meeting wherein he announced, "I feel unable to act in the affirmative since I have agreed to a strict interpretation of the law if you will." We recognize that an administrative agency has not only the power but the duty to correct what *it* determines to be an erroneous interpretation of the law or an unwise policy (*Matter of Punnett v Evans*, 26 AD2d 396). Moreover, a deviation from strict adherence to a statute may not prohibit *an agency*

from subsequently strictly enforcing that statute *(see, Matter of B'rith Abraham v Thacher,* 43 Misc 2d 129, *affd* 26 AD2d 909)*. However, because it is the agency that has the ultimate responsibility, the agency itself should make its own decision on policy changes unencumbered by outside direction or some mysterious agreement. The Board cannot be expected to operate in a vacuum, and its members are not immune from trends and experiences. Nonetheless, policy decisions remain the responsibility of the Board.

Even assuming that members of the Board had all agreed of their own volition that a change or modification of its past policy was in order, at best a nebulous assumption, it is obvious that it failed in its further responsibility to make a painstaking assessment or independent appraisal or independent conclusion *on the merits of the case,* which is mandated *(Matter of Taub v Pirnie,* 3 NY2d 188). Instead, it avoided exercising its discretion as evidenced by the Chairman's admonition before the vote when he stated, "My feeling is what we ought to do is turn them down and let them use the Article 7 proceeding or whatever they so choose. That's the only recourse left that we have." Review of the minutes following that admonition demonstrates that this was surely the course that the members followed, with at least one member abstaining. In sum, because of the uncertainty and confusion, the members threw up their hands and, in effect, determined to let the court decide the matter. Such conduct constitutes a clear abandonment of the Board's responsibility, since reliance on court proceedings to assure a just result is arbitrary and capricious *(Matter of Kilgus v Board of Estimate,* 308 NY 620) and fails to provide a rational basis for its decision or comport with the law. Having so concluded, no extensive discussion of the test used by the Board staff is necessary. Petitioner was a business concern as defined by Commerce Law former § 115 (b) and had created at least five jobs at each of the applying facilities as required by Commerce Law former § 118 (c). The test used by the staff to conclude that there were no net new jobs in New York was arrived at by charging against petitioners' newly created jobs, the loss of jobs occasioned by FCC rulings and the order of divestiture. Since there was no abandonment by AT&T or its affiliates and no transfers, as such, as is referred to in Commerce Law former § 120, this was an impermissible test not called for by the statute, its spirit or the exercise of reason. On the record before us, petitioner was entitled to the credits as a matter of law.

Were the Board still in existence, we would remit the matter to it with appropriate instructions. Unable to follow that course, we choose to invoke the inherent authority of the Supreme Court. "While the enabling act of a particular administrative agency may specifically vest exclusive original jurisdiction in [an] agency * * * a court of general jurisdiction may exercise its judicial power so long as the jurisdiction of an administrative tribunal is not interfered with" (2 NY Jur 2d, Administrative Law, § 180, at 285-286). Our exercise of these powers does not interfere with the jurisdiction of any administrative tribunal because the agency in question is no longer in existence. The Supreme Court is a court of general jurisdiction competent to entertain all causes of actions unless its jurisdiction has been specifically proscribed *(Thrasher v United States Liab. Ins. Co.,* 19 NY2d 159, 166; *see also, People v Darling,* 50 AD2d 1038; Siegel, NY Prac § 8, at 10). "The Supreme Court * * * is a court of unlimited original jurisdiction, exercising all the powers of a court of law and equity, limited only by the exceptions of the Constitution and statutes. It has the ability to fashion whatever remedies are required for the resolution of justiciable disputes and the protection of the rights of citizens * * * As a court of such untrammeled powers it may * * * invoke its inherent authority to deal with the cases before it in any appropriate manner, even in the absence of any direct grant of legislative or administrative power" *(Bankers Trust Co. v Braten,* 101 Misc 2d 227, 235).

While there may be an absence of any direct grant of legislative or administrative power, there is no specific prohibition and no interference with any administrative tribunal. Hence, in the exercise of our inherent powers, we reverse the judgment and grant the petition.

YESAWICH, JR., J. (dissenting). I respectfully dissent and vote to affirm.

Petitioner's suggestion, adopted by the majority, that the New York State Job Incentive Board (Board) abdicated its duty to exercise its discretion and further acted politically instead of independently when it determined that petitioner's service branch facilities' applications did not meet the criteria of Commerce Law former § 118 is, in my judgment, far from amply demonstrated in this record. AT&T's supposition that the Board, at its final meeting, made no decisions on the merits due to an "overwhelming predisposition toward denial"

is belied by the very action taken by the Board; it sanctioned nearly half the pending applications before it based on jobs created only, the class including AT&T. Rather than reflect a systematic denial of AT&T's applications, the record reveals that the Board's members were familiar but anguishing over how to deal with AT&T's complex situation, that its applications were processed in the normal fashion except that, although not required to do so, the Board accorded petitioner's representative the privilege of furnishing clarifying information to them and then, only after questioning its own staff and considering the applications independently, did the Board members vote.

Furthermore, the denial of approval was on the ground that the information that AT&T submitted "did not demonstrate that the projects were in fact creating net new jobs for New York State". Not only was this conclusion rational and justified, for despite repeated requests to do so AT&T failed to submit documentation of the net change in New York employment from before the reorganization of American Bell to after the creation of AT&T, thus leaving the agency without verifiable employee information, but it lends added substance to respondents' argument that the Board did in fact exercise its discretion and did so in an informed and independent manner.

AT&T's parallel argument that it was inappropriate for the Board, in determining credit eligibility, to consider whether its projects would create net new jobs in New York slights Commerce Law former § 120 (h). That section provides, in pertinent part, that "[t]he board shall not issue certificates of eligibility for any business facility which would result in the removal of a business facility of the applicant from one area of the state to another area of the state" (Commerce Law former § 120 [h]). The unavailability of credits to businesses which merely transfer jobs between different locations within the State manifests a legislative intention that jobs be created or retained in substance, not just form. The Board's reliance on net new jobs in New York thus accords with the statute.

As for the charge that the Board's change of policy from tractable to strict enforcement of the statute was incautious and improper, it is enough to observe, as has the majority, that an agency has the power and obligation to rectify what it deems to be an erroneous interpretation of the law or an injudicious policy *(Matter of Punnett v Evans,* 26 AD2d 396). A shift in agency position to ensure affecting the statute's purpose serves to indicate heightened agency conscientiousness,

not arbitrariness. While an agency's refusal to exercise discretion to achieve some political goal may well equate to an arbitrary act, given the presumption of regularity shielding agency actions, there must be more than a profusion of speculation before it can rightfully be said that the record clearly reveals that the agency elected not to exercise its independent judgment (see, *Matter of Taub v Pirnie,* 3 NY2d 188, 194). It is worth noting here, too, that nearly half the applicants qualified for tax credits under the newly altered policy, thereby evidencing that it was not unduly burdensome or unreasonable.

KANE, J. P., WEISS and HARVEY, JJ., concur with MAIN, J.; YESAWICH, JR., J., dissents and votes to affirm in an opinion.

Judgment reversed, on the law, with costs, determination annulled and petition granted.