## In the Matter of BRATEN APPAREL CORPORATION, Debtor.

### Bankruptcy No. 74-B-1256.

United States Bankruptcy Court,
S. D. New York.

June 25, 1982.

---

Moses & Singer, New York City, for applicant, Bankers Trust Co.; David B. Eizenman and Arnold A. Jaffe, New York City, of counsel.

Ruskin, Schlissel, Moscou & Evans, Rhoades & Rhoades, New York City, for debtor; Joseph J. Moscou and Richard G. Leland, Daniel A. Rhoades, New York City, of counsel.

## OPINION

ROY BABITT, Bankruptcy Judge:

On September 5, 1974, Braten Apparel Corporation (BAC or debtor) filed a petition for relief under Chapter XI of the now repealed 1898 Bankruptcy Act. Sections 301 *et seq.*, 11 U.S.C. §§ 701 *et seq.* (1976 ed.)[1] The debtor's plan was confirmed by this court on March 12, 1976. However, the confirmation of this Chapter XI plan did not end BAC's involvement with this court, for on September 10, 1976, Bankers Trust Company (Bankers), the largest creditor, moved to set aside the confirmation of this plan pursuant to Section 386 of the Act, 11 U.S.C. § 786, and its mate in the Bankruptcy Rules, Rule 11–41, 415 U.S. 1031, 94 S.Ct. 3242, 39 L.Ed.2d XLIX.

In its application, filed just short of the six-month period fixed by the statute as the time within which revocation of confirmation could be procured, Bankers, as mandated by Section 386,[2] alleged that the debtor had procured confirmation of its plan through fraudulent means and that Bankers had not learned of that fraud until after confirmation. It is Bankers' position that the essence of the fraud was the debtor's scheme to conceal from its creditors that it owned Brookfield Clothes, Inc. (Brookfield), a corporation acquired by the debtor shortly before it filed its Chapter XI petition, with the intent to reinstate the ownership after the debtor had reestablished its vitality through the Chapter XI process. And, as Bankers viewed it, the very nature of this fraud was that it could not have been discovered until events took place after confirmation. BAC, not surprisingly, denies any wrongdoing, and, in any event, BAC insists, Bankers had constructive, if not actual knowledge of the facts on which it grounds its application from its involvement in the unfolding of BAC's Chapter XI.

After extensive discovery, the trial of this dispute consumed all or parts of eighteen days, during which over 2,700 pages of often vague and conflicting testimony were adduced and over 275 documents received in evidence.

## THE EVIDENCE

BAC is a clothing manufacturer incorporated in 1968 by Milton Braten (Braten). Its stock was owned by Braten and his father-in-law, Erwin Klineman (Klineman). (Exhibit A to BAC's Chapter XI petition). Before his involvement in BAC, Braten had been employed as a certified public accountant by a well-known accounting firm (50).[3] BAC's business was financed by Bankers pursuant to a revolving credit arrangement

---

1. The 1898 Bankruptcy Act was repealed by Section 401(a) of Title IV of the Bankruptcy Reform Act of 1978, Pub.L.95–598, U.S.Code Cong. & Admin.News 1978, p. 5787. Section 403(a) of these Title IV amendments makes it clear that cases commenced under the 1898 Act, as this one, will continue to be governed by its provisions. Unless otherwise indicated, all citations herein are to the 1976 edition of Title 11 of the United States Code.

2. Section 386 provides, in relevant part:

"If, upon the application of parties in interest filed at any time within six months after an arrangement has been confirmed, it shall be made to appear that fraud was practiced in the procuring of such arrangement and that knowledge of such fraud has come to the petitioners since the confirmation of such arrangement..."

3. This and succeeding references are to pages of the trial record. Exh.___ refers to those documents in evidence at the trial.

first established in March, 1971.[4] BAC prospered until the Spring of 1974 when it began experiencing financial difficulties, partially due to industry-wide conditions. Bankers was aware of these difficulties (170–1, 409, 1030; Exh. B).

In the Spring of 1974, a lucrative opportunity appeared on the horizon. At that time, Philips Van Heusen Corporation (PVH) decided to divest itself of its Brookfield division which had been operating at a loss for several years [5] (136). Herman Soifer (Soifer), a lead character in this saga, had organized Brookfield in 1948 and operated it successfully until its sale to PVH in 1969 (389). At that time, Soifer, a successful, well-known and highly regarded figure in the textile industry, left the scene to retire.

Although the early details of the genesis of the "Brookfield deal" are in a state of some confusion, Soifer testified that the PVH people approached him as to his possible reacquisition of Brookfield in the Spring of 1974. But as Soifer was content with both his retirement and his financial picture, he did not want any financial exposure. Soifer was willing, however, to run the Brookfield business, possibly pursuant to an employment agreement, and Braten was brought in to handle the financial details of this transaction (1029, 1436, 1483).

Soifer was a personal friend of Klineman, Braten's father-in-law, as they had both belonged to the same Westchester club, the Fenway, for some 25 years. Braten was also a club member (52, 395). In fact, in 1971, Klineman brought Soifer in to do some consulting for BAC (394). According to Soifer, he had both high regard and a personal liking for Braten and he considered him to have a "touch of genius" (1425–27). Apparently, this "personal relationship" alone satisfied Soifer as to the new role he might have in the clothing business. This is clear from Soifer's testimony that he knew nothing of Braten's financial condition at that time. In fact, Soifer went so far as to testify that he had never asked (1030). Moreover, Soifer did not know BAC was then experiencing financial difficulty, and, although Braten was coming in to supply the required working capital for this new venture, Braten and Soifer both agreed that the financial needs of Brookfield were never discussed (407–8, 413). According to Soifer his personal relationship with Braten was enough.

Negotiations continued throughout June among Soifer, Braten and PVH. At that time, the firm of Hahn, Hessen, Margolis & Ryan (Hahn, Hessen), Braten's (and BAC's) regular counsel, saw to the legal work on the acquisition (73). In early August, Braten approached Bankers to finance the new venture. According to an August 2, 1974 memorandum in Bankers' file, Braten was told that Bankers had to turn down his request "as we feel BAC has enough problems on its own" (170; Exh. B).

Nonetheless, the acquisition negotiations went smoothly, and August 7, 1974 was chosen as the "closing date". All papers were prepared and these reflected PVH as the seller, BAC as the acquirer and "Brookfield Industries", a wholly owned subsidiary of BAC, as the acquiring entity. Soifer's name did not appear on any documentation through that date (Exh. 4—"Acquisition Agreement"). Indeed, Soifer understood he had no interest at that time (419).

At that final hour, Walter Feldesman, Esq., then of Feldesman and D'Atri, was brought in to close the deal (74), "for both Soifer and Braten". According to both Braten and Soifer, Soifer decided Feldesman's negotiating skills were essential (74, 1142), while, according to Feldesman, he was representing only Soifer's interests (142). There was no testimony as to what

---

4. The controversy over the "termination" of this relationship constitutes another facet of the unremitting warfare between Bankers and BAC. For further insight into this shattered relationship, see, *In re Braten Apparel Corporation; Bankers Trust Company v. Braten Apparel Corp.*, 10 C.B.C. 122 (Bankr.S.D.N.Y.1976); *aff'd, In re Braten Apparel Corp.* unreported (S.D.N.Y.1977, Cooper, *D.J.*)

5. In early Spring, 1974, the Brookfield division of PVH had $3.4 million in assets. It sustained losses of $2 million per year.

expertise Feldesman supplied. However, it should be noted at this juncture that Feldesman, a fellow Fenway club member, had never before represented Soifer (74, 202, 597, 1135–36), but he was a long time friend of Klineman, Braten's father-in-law.

The acquisition agreement between BAC and PVH gave BAC the $3.4 million Brookfield assets for $1.00 subject to trade liabilities (80, 90; Exh. 46). The acquisition agreement was prepared with the acquiring entity as Brookfield Industries, BAC's wholly owned subsidiary. According to Braten, it was always intended that Brookfield Industries be the acquiring entity even though Braten knew that the name was unavailable as far back as May, for Hahn, Hessen was negotiating on his behalf to obtain it (713). Apparently, Hahn, Hessen's negotiations were successful, for on August 12, 1974 a certificate of incorporation for Brookfield Industries (Industries) (Exh. 13) was filed by Hahn, Hessen (605, 607, 610, 714). But this corporation was not utilized until after confirmation of BAC's Chapter XI plan. However, as Industries was not available at closing, Feldesman caused MBC Apparel Corporation (MBC), a wholly owned subsidiary of BAC, to be incorporated on August 7 to serve as the acquiring entity (215; Exhs. 14, 16).[6] An escrow period was written into the deal, making the acquisition effective on the close of business on August 12, 1974 (Exh. 4–C).

On August 12, there was a flurry of activity regarding MBC's name. On that date Hahn, Hessen filed a certificate of amendment (Exh. 15) changing the name of MBC Apparel Corporation to Brookfield Clothes, Inc.[7] And, although the name

Brookfield Industries was then available, Braten never explained why it was not used.

On August 13, 1974, Braten[8] and Soifer each gave guarantees to Chase Manhattan Bank (Chase) as part of Brookfield's factoring arrangement (Exhs. 5, 5a, 5b, 7, 10). Soifer was not troubled at giving his $250,000 guarantee notwithstanding the fact that he did not want any financial exposure and at that time had no apparent interest in Brookfield and did not know to what extent he would become an owner (418–19). According to Soifer, he went to Chase on August 13 because he had been advised by Braten the day before that Braten did not have the money to put into the business (421–22).

After committing himself to this guarantee, Soifer immersed himself in running Brookfield, notwithstanding the fact that he had not yet discussed with Braten what their respective interests in the company would be (410–11, 417). According to both Soifer and Braten, after August 12, both were too busy to finalize the transaction and planning was shelved (263, 535–38).

The first document to actually indicate Soifer's interest in Brookfield is a written shareholders' agreement (Exh. 11), dated as of August 7, 1974 between BAC, Pearl Soifer, as trustee, and Brookfield Clothes, under which BAC was made to appear to have lost its stock interest in Brookfield. According to Bankers, the essence of the fraud is that this shareholders' agreement was a sham, never intended to have legal effect. Although Soifer, Feldesman and Braten were unable to agree on the date and place of its execution, the overwhelming weight

---

**6.** Pursuant to a letter agreement, dated August 7, 1974, all references to Brookfield Industries in the acquisition agreement were to be read as MBC (Exh. 4–A).

**7.** The certificate changing the name of MBC Apparel and the written consent of BAC as sole shareholder were forwarded to Braten by Hahn, Hessen for execution on August 9 (Exh. 5). For some unexplained reason the "original" letter of Hahn, Hessen was found in Feldesman's files (1474–8).

**8.** Braten's $250,000 guarantee was outstanding until September 3, 1975, when it was returned by Chase Manhattan Bank, together with Soifer's to Feldesman, and Feldesman returned the cancelled guarantee to Braten (Exh. 9A).

Braten apparently told no one of this guarantee as it had "slipped his mind" (310). He could not explain why it was returned at that time. However, it should be noted that Soifer arranged for new financing with Meinhard-Commercial Corporation (Exh. V) in September, 1975, thus terminating Brookfield's relationship with Chase (Exh. 64).

of the evidence indicates it was executed, if not drafted, sometime after August 12, and before August 27, 1974. The importance of the August 27 date is discussed in detail, *infra.*

The shareholders' agreement was prepared by Feldesman to protect Soifer's interest, although how this is so is not clear as will be seen, *infra.* According to Feldesman, it was drafted without negotiation or discussion with Braten. Feldesman merely gave it to Braten, telling him this is what it will take to get Soifer, and Braten signed it without consulting his then counsel, Hahn, Hessen (202).

Feldesman testified that the shareholders' agreement was of a type which he had done many times and could prepare within a day (1148). Although it is unclear when or by what impetus it was drafted, absent evidence that Feldesman discussed the terms of the transaction with any one, it is clear Soifer did not execute it until sometime after closing on August 12 (1402–04), as Soifer remembered signing the agreement after Braten told him he could not supply the working capital (421). Indeed, Soifer admitted he did not have a signed paper giving him any interest in Brookfield until after executing the guarantee (418–19). Feldesman's testimony is in conformity with this, as he said he gave both the shareholders' agreement and stock certificates to Soifer for execution at the same time, although Feldesman's office did not even get the *blank* stock certificates back from the stationers until August 13 at 3:30 P.M. (1408; Exh. 87).

The only point of agreement among Feldesman, Braten and Soifer is that the shareholders' agreement validated what had always been understood to be Soifer's interest in Brookfield. The first page of this document unambiguously states that BAC and the (Pearl) Soifer Trust [9] own all of the issued and outstanding shares of stock of Brookfield, *i.e.*, BAC—20 shares; the Trust—20 shares.[10]

Paragraph 14 of the agreement carries the protective feature which, Feldesman testified, served to protect Soifer. By this provision, BAC [11] was bound to furnish

---

**9.** For the purposes of this opinion, there is no distinction between Pearl Soifer, as trustee of this trust, and her husband, Herman.

**10.** The first page of the shareholders' agreement reads as follows:

"WHEREAS, Brookfield is a corporation organized under and by virtue of the laws of the State of New York, and has an authorized capitalization of two hundred (200) shares of common stock without par value, of which twenty (20) shares are issued and outstanding; and

WHEREAS, the Trust, contemporaneously herewith, has acquired twenty (20) shares of the said common stock; and

WHEREAS, the parties, following such acquisition by the Trust, will hereto own all of the issued and outstanding shares of stock of Brookfield, the holdings of each party being then as follows:

Braten          Twenty (20) Shares
The Trust       Twenty (20) Shares"

**11.** The relevant portions of Paragraph 14 of the shareholders' agreement read as follows:

"14. The parties understand and acknowledge the following: . . .

(b) Braten has acquired twenty (20) shares of the stock of Brookfield, subject to the condition that either Braten or Milton will, on or before August 23, 1974, furnish, by way of a subordinated loan to Brookfield, Two Hundred Fifty Thousand ($250,000.00) Dollars (said loan to be for a period of five (5) years and self-liquidating in annual equal installments and bearing interest at the rate of one (1%) percent over prime commercial rate from time to time obtaining). (c) It is the intent and purpose of this paragraph '14' that Herman suffer and bear no risk or exposure of any kind or by reason of his participation in and association with Brookfield, and that the Trust which he has created will own fifty (50%) percent of the capital stock of Brookfield (viz., twenty (20) shares of the common stock of Brookfield), which shares represent fifty (50%) percent of the outstanding shares of Brookfield; and that his investment in Brookfield and the business thereof shall be solely and only that of his time as the general manager thereof. (d) In the event that for any reason the aforementioned loan of $250,000.00 is not furnished to Brookfield at the time as aforestated, then Braten shall cease to have any interest in Brookfield and shall assign and transfer, without any consideration and without the need for any further agreement or stipulation, the said twenty (20) shares to Brookfield owned by Braten. (e) In implementation of the foregoing, Braten does hereby deposit with Herman the aforesaid twenty (20) shares of the capital stock of

$250,000 by way of a subordinated loan to Brookfield on or before August 23, 1974, and if the $250,000 were not furnished to Brookfield by August 23, BAC would lose its 50% stock interest and Soifer would then own 100% of the outstanding Brookfield stock.

In conformity with the shareholders' agreement, Braten executed the stock certificate in blank and left it and his resignation [12] as an officer and director of Brookfield (Exh. 22) with Feldesman pursuant to an oral escrow agreement.

Feldesman testified that this shareholders' agreement best served Soifer's desire to be free from exposure (994, 1164), although how making Soifer sole owner of Brookfield would achieve this is not clear (1438). However, both Soifer and Braten agreed that the shareholders' agreement was an interim step towards finalization of the deal.

After August 12, BAC's downfall came swiftly. On Friday, August 23, Clarence Rainess & Co. (Rainess), BAC's independent auditors, advised Braten that they would have to obtain more current financial information before they would continue to accompany him on any further meetings with potential BAC or Brookfield creditors (Exh. 12; 173, 182–83). In fact, on Saturday, Lawrence Cornfeld, BAC's controller, met with representatives of Rainess and reviewed BAC's most current data (Exh. 12). The Rainess partners advised Cornfeld that, based on what they had seen, it appeared that for the 10 months ended July 30, 1974, BAC had sustained a pre-tax loss of $2.7 million and had a negative net worth of $420,000 (Exh. 12). That weekend, Cornfeld spoke to Braten to tell him Rainess had come up with some "crazy numbers" (175,

183–4), and Mr. Schwartz, a Rainess partner, met with Klineman to apprise him of BAC's "terrible" financial condition (511–12).

On Monday, August 26, a luncheon meeting was held to discuss BAC's financial condition, and the figures were reported. Representatives of Rainess, Erwin Klineman and Emory Klineman, and Jules Hessen, Esq. of Hahn, Hessen, were in attendance (185; Exh. 12). After the luncheon, Mr. Hessen advised Braten that he should contact Bankers and inform them of these devastating figures before someone else did. At that point Hahn, Hessen resigned as counsel to BAC (185–86; Exh. 12).

That same day Braten met with representatives of Bankers (186–87; Exh. 12) and advised them of the most current figures. In response to a request by Mr. Powderly, a Bankers' officer, both Braten and Klineman said they were unwilling to and were also unable to put new money into BAC (Ct. Exh. 3; 68–78). Powderly also asked Braten the status of the Brookfield acquisition (187–8). Braten, a certified public accountant who, only a week earlier, had been meeting with potential creditors of Brookfield, stated that he did not know (75, 187–88, 259, 293), and that he had left all the papers with Soifer's attorney (192). Upon questioning at trial, Braten testified that at that time "it never crossed my mind at that point I or a company I was affiliated with didn't have an interest, it never crossed my mind, I wouldn't be involved in Brookfield" (292). Braten merely offered to furnish the papers to Powderly the following morning.

On the morning of August 27, Braten met with Feldesman at Feldesman's office and picked up the shareholders' agreement

Brookfield, together with stock powers duly endorsed for transfer, and together with the resignation of Milton as Secretary, said shares and resignation to be held by Herman in escrow and to be delivered over by Herman to the Trust in the event that the said loan is not furnished within the time. If the aforementioned loan is furnished within the time aforestated, then the said shares and resignation shall be returned to Braten with the express

understanding that said shares shall be and remain the property of Braten and the resignation shall be deemed to be void and of no force and effect."

12. Although this resignation (Exh. 22) deals with Braten's resignation as officer and director of *Industries*, all agreed that Industries was intended to be changed to Brookfield Clothes.

(197, 268). However, notwithstanding the fact that he was on his way to a meeting with Bankers' representatives regarding the status of "Brookfield", Braten insists he did not discuss the Brookfield deal with Feldesman (269).

Bankers' counsel, Arnold Jaffe, Esq., attended this meeting and he examined the shareholders' agreement. After his examination, and in light of the clear language of paragraph 14, he asked Braten if the $250,-000 had been put in by the specified date, August 23. Braten simply said "no" (188, 192). Jaffe therefore concluded that BAC had no interest in Brookfield (291, 1739–40), and he so advised those in attendance.

At this trial, Braten was closely examined as to his understanding of the status of Brookfield's ownership at that time. It is clear that Braten, as well as Soifer, only considered the shareholders' agreement as an "interim" measure; something either Feldesman or Soifer wanted until Braten and Soifer could finalize arrangements (191, 194, 209, 254, 299). Additionally, Braten testified that at that time he assumed he had satisfied the $250,000 working capital requirement by giving Chase his personal guarantee (291–3). Furthermore, Braten felt that he always personally had the ability to provide the cash infusion, but he did not think he had to (205). Indeed, when Braten told Soifer he did not have the $250,000 working capital, there is no evidence that Soifer expected anything more than a guarantee. Furthermore, the first time Soifer even asked for the $250,000 called for by paragraph 14 was after he learned that Bankers had stopped financing BAC (487).

After the meeting with Bankers, Braten went to Feldesman's office to advise him of Jaffe's conclusion (207, 290–91). According to Braten, Feldesman agreed that Braten's or BAC's failure to lend Brookfield $250,000 by August 23 had resulted in the loss of BAC's stock interest in Brookfield (291). In fact, Feldesman testified he had already transferred BAC's Brookfield stock on August 24 (237–39, 505, 1415, 2007; Exh. 24), although Braten, Feldesman and Soifer agreed there had never been any discussion concerning the necessity that Braten contribute the $250,000 (250, 489). And, according to Braten, there was no further discussion as to BAC's interest in Brookfield, merely Feldesman's confirmation that BAC had forfeited its interest. Both Soifer and Braten agree that they never discussed that BAC had lost its interest in Brookfield as both were just too busy (489).

On August 29, an article appeared in The Daily News Record, a textile industry newspaper, headlined "Soifer Now Sole Brookfield Owner" (Exh. 26).

Notwithstanding that Feldesman had just told Braten that he had lost his interest in a company in which he always assumed he would have an interest, Braten, upon Feldesman's advice, met with Isadore Leinwand, Esq. of Leinwand, Maron, Hendler & Krause, to explore the possibility that BAC file a Chapter XI petition (26–28). Leinwand also concluded that BAC had lost its interest when the $250,000 was not forthcoming (43). Braten did not tell Mr. Leinwand of his own understanding that the Chase guarantee satisfied the working capital requirement or that the shareholders' agreement was merely an interim measure. It should be emphasized that by this time every attorney who had reviewed the Brookfield documentation had come to the conclusion that BAC had lost its 20 shares representing a 50% interest in Brookfield, and that Braten supplied no reason for them to conclude otherwise (193).

On September 4, 1974 a meeting was held among Braten, Leinwand, Jaffe, Cornfeld, other Bankers' representatives and Feldesman (316, 1554, 1747; Exh. CC). Feldesman, as attorney for Soifer, stated that Soifer would extend the date in the shareholders' agreement, and would permit BAC to reacquire its 50% interest in Brookfield, if the creditors would advance the $250,000, and if Soifer were to be indemnified on the guarantee he had given to Chase (314–317, 1747–8; Exh. D).

On September 5, 1974, BAC filed its Chapter XI petition. Its schedules, sworn to by Braten, bore no reference to the stock

of Brookfield. In paragraph 11 of its Statement of Affairs, also sworn to by Braten, BAC stated that no other person was holding anything of value in which it had an interest, and in paragraph 14, BAC swore that it had made no transfers of property or any other dispositions outside the ordinary course of business.

From the outset, Bankers was suspicious of the entire Brookfield matter (1622; Exh. C). As BAC's largest creditor (351), it had chaired the creditors' committee, whose counsel was Morton Gitter, Esq. of Otterbourg, Steindler, Houston & Rosen.[13] Jaffe, determined to further investigate the Brookfield transaction, prompted the formation of an investigative sub-committee of the creditors' committee to probe deeper into the surrounding facts and circumstances of Brookfield's ownership (1750). Gitter, chairman of this sub-committee, met with Feldesman in November, 1974 (659, 1563–66; Exh. I). Feldesman met with Gitter as Soifer's representative, although he testified both he and Soifer had no interest in the unfolding of BAC's Chapter XI case.[14]

Gitter was told by Feldesman that BAC had lost its interest by reason of its defaults under the shareholders' agreement (1170, 1619–20), and they had an in-depth discussion on the particulars of the Brookfield acquisition. In support of his view that BAC had lost its Brookfield interest, Feldesman reviewed all supporting documentation, including both the shareholders' agreement (1577, 1618, 1915) and the Trust Agreement creating the Pearl Soifer Trust (Exh. SS). Indeed, Feldesman succinctly characterized the tenor and outcome of this meeting in the following words:

"And, we discussed the ownership and I traced for him the events as they transpired, which I then very clearly had in mind, from the time I was asked by Soifer to undertake the closing.

And, I exhibited all of the documentation that I had bearing on the total of the Brookfield Clothes file. We looked at it together and, I believe, examined each document. Whether or not we ran off copies of documents at that time I really don't recollection [sic]; whether we did it at a subsequent date I don't recollect. But, to the best *of my recollection he was satisfied as I was that Herman Soifer through the Pearl Soifer Trust, or himself, owned one-hundred percent of the stock of Brookfield*" (1915–16). (emphasis added)

On December 12, 1974, BAC's first major creditors' committee meeting in its Chapter XI case was held (1227). Braten was in attendance (1232; Exh. J). Gitter, based upon his investigation, advised the creditors that BAC had no interest in Brookfield (333, 1227, 1629). Distributed at that meeting was a draft of a financial statement, prepared by Main LaFrentz & Co., accountants (Exh. 47). This document contained an analysis of the Brookfield transaction (665, 1214–19; Exh. 47, note 12), taken word for word from Braten's own handwritten notes. It, too, concluded that BAC had lost its interest in Brookfield (12, 668–69, 1218–20). At this meeting, a suggestion was made by the creditors that Braten get in touch with the Brookfield people to negotiate some form of merger, as BAC's net operating loss would be of value (101).

Sometime, too, in this early period, Braten was examined by Gitter (30–35, 38–39,

13. Gitter, as is true of most every other attorney on either side of this case, could not locate his records relevant to BAC's Chapter XI (616). Feldesman's diaries were said to have been lost in his recent move (1130).

14. It should be noted that although both Soifer and Feldesman testified that Soifer was not interested in BAC's affairs (1483), Feldesman, apparently as counsel for Brookfield, was monitoring BAC's Chapter XI. And Soifer received numerous letters advising him of important occurrences (Exh. 90). Furthermore, although Feldesman testified that he had no involvement with either BAC or Braten, there is correspondence in his file relating to the day to day operation of BAC's business. (Exh. 75—November 15, 1974 letter to Braten at BAC concerning a form Braten had to execute on behalf of BAC for the Department of Labor; Exh. 74—September 13, 1974 letter to Braten at BAC).

1623).[15] At this examination, Braten confirmed that BAC's deal with Soifer had fallen through when BAC failed to meet its monetary obligations under the shareholders' agreement (30–35, 38–39, 43–45). At the trial, Gitter testified that at that point he was satisfied with Braten's testimony and laid the matter to rest (1684).

However, it is clear that Braten, throughout this entire period, never told anyone that he felt he had already satisfied the working capital requirement by giving a personal guarantee. Indeed, he never once mentioned the guarantee which had remained in place with Chase. Indeed, he never once raised any of his other doubts about BAC's loss of Brookfield.

After this string of early events, Bankers resigned from the creditors' committee as its path diverged from that of the other creditors.[16] And, although dissatisfied with the explanations already uncovered, Bankers conducted no further investigations of the whole troubling BAC, Brookfield, Soifer convergence.

And as though there were not already enough entities involved in all this and in the BAC Chapter XI, around this time enter Daniel Rhoades, Esq., *eminence grise*, as counsel to Braten (521), and later special counsel to BAC (1872). Although Feldesman had just structured the Brookfield transaction to enable Soifer to gain control over a company "Braten always felt he'd be involved in" (292), Rhoades was retained at Feldesman's suggestion (292)! On Decem-

ber 18, 1974, Leinwand's firm was replaced by the law firm of Arutt, Nachamie & Benjamin (Arutt, Nachamie) (45–6), a change made at Rhoades' suggestion for, according to Braten, Rhoades "was not happy with what Leinwand was doing for us" (329).

In the Spring of 1975, Feldesman reappeared in these proceedings in a somewhat different guise; now to negotiate what he termed a "global settlement" to include a Chapter XI plan for BAC, a settlement of Bankers' claim against BAC, and a settlement of the multitudinous state court actions (649, 1499–1501, 1754–68). Included in Feldesman's settlement was a proposed Chapter XI plan pursuant to which Brookfield might guarantee notes representing 5% of BAC's payments to creditors (1771; Exh. B). Additionally, BAC would be pared down to become sales agent for Brookfield and ultimately to be taken over (Exh. 56c). Feldesman's global settlement was rejected by Braten and by Rhoades (341, 695).

Although Feldesman at first testified that he attempted this global settlement at the request of his long time friend, Klineman [17] (1171), he later admitted that he had both Soifer's, (Brookfield's) and Klineman's (BAC's) interests in mind.[18] Feldesman had appeared before this court on June 11, 1975, in the course of the BAC Chapter XI and advised it that he represented Klineman (1122, 1126). Soifer's testimony as to Feldesman's involvement in the global set-

---

**15.** Although the transcript of this hearing was curiously missing, Braten, Gitter and Leinwand all recalled that it took place (1221, 1616).

**16.** A problem in this case has been the fierce enmity between not only BAC and Bankers, but also among the respective parties' attorneys. One possible reason for this hostility is the commencement by both sides of various and sundry state court lawsuits. Among these lawsuits was one by Bankers against Braten and the Klinemans on their personal guarantees; and by BAC, Braten and the Klinemans against Bankers. For an insight into the extent of these disputes, see, *Bankers Trust Company v. Braten*, 101 Misc.2d 227, 420 N.Y.S.2d 584, (Sup.N.Y.1979); *In re Braten Apparel Corporation*, No. 74 B 1256 (Bankr. S.D.N.Y. April 29, 1981).

**17.** Pursuant to a written agreement dated April 8, 1975 between Braten and Klineman, Braten relinquished control of BAC's Chapter XI through May 30 (1472, 1581, 1598; Exhs. 41, 41A). Klineman ultimately funded BAC's Chapter XI plan with $700,000 (125).

**18.** Notwithstanding Feldesman's active involvement with these proceedings at this time, he could not recall being paid for his services by either Soifer or Klineman, and his records did not indicate that any bills were sent out (1126–27, 1385–87, 1872). However, Feldesman was on retainer with Brookfield since October 1974 at a $1,500. monthly rate.

tlement negotiations is somewhat inconsistent with Feldesman's as Soifer insisted that he was ignorant of Feldesman's active involvement in BAC's Chapter XI on behalf of Brookfield. As Soifer saw it, Feldesman's activities were totally unauthorized (955–56, 1060). Soifer insists that the first he learned of Feldesman's involvement with these "global settlement" negotiations was upon his attendance at a May 30, 1975 meeting at Feldesman's office where this settlement was discussed (1069). Soifer insists that he left as soon as he heard what Feldesman had in mind (548–50, 585–87; Exh. 73).

However, the record strongly suggests that Soifer received memoranda from Feldesman informing him of the unfolding of the negotiations (Exhs. 73, 77, 78). On further questioning, Feldesman admitted that he had always been interested in the possibility of a merger between BAC and Brookfield to take advantage of BAC's net operating loss (1385, 1387), and that he had on more than one occasion structured mergers without authorization (1183). Feldesman left the picture in late June (1501, 1515), and in July, 1975, BAC filed its proposed Chapter XI plan (Exh. 27).

In late August, 1975, BAC commenced an action against Rainess, its erstwhile accountants (the Rainess suit) (343; Exh. 28). In its verified complaint BAC alleged, in effect, that Rainess had slandered BAC when it gave its figures to Bankers on August 26, 1974 which caused the bank to terminate BAC's credit. BAC's complaint expressly alleged that one of the consequences of Rainess' slander was that a merger between BAC and a company "having substantial assets was aborted". According to Braten this "company" was Brookfield (343–44). At this time also pending were BAC's actions against Bankers for several million dollars.

As a result of negotiations pressed by Jaffe and the creditors' committee (346, 1654, 1777–78), BAC's proposed Chapter XI plan was amended to provide that creditors would be entitled to 50% of the net recovery received by BAC in its actions against Rainess and Bankers (Exh. 29, p. 2). This amended plan was accepted by BAC's creditors in accordance with the commands of Chapter XI in September, 1975, and a certification to that effect was signed by Gitter, Arutt, Nachamie and initialled by Rhoades, and filed on September 10 (720; Exh. 30). Bankers' acceptance was required and obtained since its claim for over $4,000,000. was necessary in order for BAC to obtain a majority in dollar amount needed for acceptance of its plan.

In late September, 1975, BAC served an amended complaint in the Rainess suit. This pleading was verified by Rhoades and made more specific BAC's claim that Rainess' slander had deprived BAC of the valuable Brookfield opportunity (354; Exh. 31 ¶ d). This complaint stood until June 18, 1976 (2575), when, after confirmation of BAC's amended Chapter XI plan by this court, another amended complaint was filed by BAC removing all allegations concerning the loss of the Brookfield opportunity (Exh. 32). The importance of this change will be discussed, *infra*.

According to Braten, sometime in October or November, 1975 Rhoades made a startling discovery—*that BAC had never lost its*[19] *50% interest in Brookfield in August, 1974, but, in fact, still owned 100% of that corporation* (74, 356–64, 723, 733, 748, 1487).[20] Rhoades' theory was never made clear.

---

**19.** This is not the only instance in which Braten was involved in a dispute over a lost stock interest. Braten had stock in a South Carolina corporation that he transferred to his uncle, Emery Klineman, on May 23, 1974. As a result of litigation over the ownership of this stock, there was an ultimate determination that Braten had never lost his stock interest (677, 2634–35).

**20.** According to Rhoades, in October, 1975, he began to "ask questions" (2457), but did not conclude that BAC owned Brookfield until Soifer publicly announced it in August, 1976 (2550–1; Exh. 104). Braten testified that Rhoades was never certain as to BAC's 100% ownership of Brookfield until after confirmation of BAC's Chapter XI plan in March 1976, when Rhoades first reviewed a copy of the

Braten testified that he telephoned Soifer in Palm Springs to apprise him of this discovery in early January, 1976. It was around this time that the Pearl Soifer Trust was terminated although neither Feldesman nor Soifer knew why this was done (527). Soifer, apparently untroubled with Feldesman's prior representation of BAC's interest in the global settlement negotiations (567, 572, 584), told Braten to talk to Feldesman (114, 361–62, 365). In March, 1976, Braten and Rhoades flew to Palm Springs to again inform Soifer that BAC owned Brookfield, at which time Soifer again referred them to Feldesman (567, 572, 582–87). Both Jaffe and Gitter testified that they were never told about Rhoades' discovery (2539–40).

In early January, 1976, Rhoades and Braten had discussed with both Soifer and Feldesman an amendment to BAC's Chapter XI schedules to reflect BAC's "newly discovered" ownership of all of Brookfield's stock (115, 726–8, 883; Exh. 22). Rhoades told Braten it was important to let Soifer know of their intentions to amend (730, 788). Feldesman denied any knowledge of the amendment (1073–74, 1381).

Rhoades testified that it was around this time that he began to work on the wording of the amendment (2477–78), and that he had instructed Arutt, Nachamie, BAC's Chapter XI counsel, to prepare the document (884). In fact, Rhoades told Arutt, Nachamie that Soifer was in charge of a very substantial business and was trying to take it for himself (2477–81). However, notwithstanding Rhoades' understanding that schedules ought to be promptly amended upon learning something new requiring disclosure, the proposed amendments were not delivered to Gitter for his approval until March 8, 1976, just three days before confirmation of BAC's Chapter XI plan (Exh. 49).

On January 27, 1976, this court held a hearing on "feasibility and best interests", pursuant to Section 366(2) of the Act, 11 U.S.C. § 766. Braten testified at this hearing, and BAC contends that it is this testimony that apprised the Bank of the Brookfield interest, or at least provided constructive notice, that BAC was claiming 100% ownership of Brookfield. Braten's testimony adverting to Brookfield came toward the end of the hearing and was as follows:

"Q. Now, does the debtor in possession own stock in any other corporations?

A. There is a question. We believe we own stock in a company called Brookfield but at the moment that's a question to be litigated. There is a dispute over that. It's something that the committee has been aware of and discussed with us, going way back, and it's something yet to be resolved.

THE COURT: What do you mean it's a question of who owns it? Give me a bird's eye view?

THE WITNESS: There seems to be a question whether or not we had a right to make a transfer prior and the transaction was explained to me by the attorney for the other party prior to filing.

Subsequent to the filing it was looked into by Mr. Gitter who has come up with a different opinion and we have to pursue that as a fiduciary and determine what our rights are.

Q. On the date of the filing, what was the value of that stock?

A. I don't know. I guess, through hearsay, or whatever, it is,—I know there was an opening statement for that company in August of 1974 that showed a deficit net worth but I don't know if that's the true net worth.

THE COURT: Is the stock being traded?

THE WITNESS: No, it's a privately owned company."

Sometime earlier in January, 1976, Jaffe and Rhoades had a conversation. According to Jaffe, Rhoades advised him he had devised a theory for BAC to sue Soifer to get back the 50% stock interest in Brookfield lost under the shareholders' agreement pursuant to what Rhoades perceived as an illegal penalty. It is Jaffe's position that

Pearl Soifer Trust agreement he then received from Feldesman (77; Exh. SS).

Rhoades agreed that the creditors would share in that recovery in a manner similar to that agreed to in BAC's amended plan concerning the outstanding suits against Bankers and Rainess (1782–84, 2396–97).[21] Apparently nothing more was done to implement this agreement.

On March 8, 1976, Braten telephoned Gitter to tell him BAC was amending its schedules as Rhoades had devised some "crazy theory" to sue Soifer (1642). According to Gitter, Braten reiterated that BAC was not claiming that BAC owned Brookfield (1646), but rather that Braten told Gitter the amendment was needed to prevent Soifer from raising a defense based upon the omission of Brookfield from the schedules (1643, 1708). At the trial, Braten testified it was his understanding the amendment referred to BAC's 100% ownership of Brookfield (756), but gave no factual basis for a suit against Soifer or the gravamen of Rhoades "crazy idea" (1649).

After this telephone conversation, the amendment was sent to Gitter's office (1644). The amendment, which contained 11 additions to other schedules dealing with contingent and unliquidated claims, treated the Brookfield matter in the following fashion:

"B–2–t  Stocks and interests in incorporated and unincorporated companies.

1.  Twenty shares of common stock of *Brookfield Clothes Inc.*—the ownership of these shares is in dispute; no market for this stock exists; no market value has been established; and a statement of book value of the stock indicates a negative book value as of the date of the commencement of this proceeding" (Exh. 49, p. 4)

As already noted, Gitter had investigated "Brookfield" at the outset of the Chapter XI. He had examined Braten and Feldes-

man, and had concluded that BAC had no interest in Brookfield (1618–29). After reviewing the amendment, Gitter called Braten to get a firm understanding of the intendment of the amendment, and Braten assured him he was not claiming to own anything. Instead, he was hoping to use the amendment to get something from Soifer at a later date (1644). Braten also told Gitter he did not know the financial condition of Brookfield, and Gitter assumed it was worthless (1729). Gitter understood this to mean that Braten, with Rhoades' guidance, was trying to recover the 50% of Brookfield lost in August, 1974 (1649). Although Gitter felt Rhoades' claim to be baseless, he understood this claim as being consistent with Rhoades' litigious nature (1650), and thereupon consented to the amendment without speaking to any creditor (1648, 1711).

The amendment was handed to the court[22] on March 9, 1976. It is BAC's position that the amendment and the hearing that followed clearly put all interested parties on notice that BAC now claimed to own 100% of Brookfield. Jaffe was present in court ready for a trial on the extent of its lien. Gitter was also in court at that time. Before the lien trial commenced, Rhoades handed up the amendment, characterizing it as containing "strictly routine claims" (March 9, 1976 transcript, p. 3).[23] This presentation certainly did not indicate that anything startling or new was being introduced. However, Jaffe immediately objected to what he called an eleventh hour amendment. Jaffe testified that he immediately linked this amendment to his January, 1976 discussion with Rhoades, and he informed the court that Rhoades agreed that creditors were entitled to share in any claim BAC had in Brookfield (Ct. Exh. 3, p. 9). Jaffe's testimony clearly indicates his

---

21. Rhoades testified that he had merely suggested that Bankers bring suit on behalf of creditors, the proceeds of which creditors would share (1782–84, 2396–97).

22. The court's function in the amendment process is to determine who, if anyone, is entitled to notice. See Rule 110 of the Rules of Bankrupt-

cy Procedure, 411 U.S. 1009, 93 S.Ct. 3104, 37 L.Ed.2d XL, made applicable in Chapter XI cases by Rule 11–12, 415 U.S. 1015, 94 S.Ct. 3241, 39 L.Ed.2d XLII.

23. This transcript, entered into evidence as Court's Exh. 3, is hereafter cited as Ct. Exh. 3.

understanding that the amendment referred to the "20 shares" originally investigated by the creditors' committee, and determined at that time to have been lost.

The court, exasperated with the hostilities governing these proceedings, and well aware confirmation was days away, called for an immediate hearing. The court, however, made it quite clear it was convinced the entire Brookfield matter had been already thoroughly investigated and besides, was of little or no value (Ct. Exh. 3, pp. 17–18, 24–26).[24] Jaffe, Gitter, and Rhodes appeared and testified.

At the instant trial looking to revoke the order of confirmation, Rhoades testified that the 20 shares listed in the amendment referred to all of Brookfield's then outstanding stock (921–22).[25] But he admitted that he was not then sure that "20" was the correct number, as he had not reviewed Brookfield's books at that time (921–22). However, it is BAC's position that the amendment was clear as to its claim of total ownership, with the Rhoades testimony at the March 9 hearing elucidating this position.

However, a close reading of the March 9 transcript reveals quite clearly that Jaffe,[26] Gitter[27] and the Court all appear to have understood that the "20" shares listed in the amendment were those very shares previously determined to have been lost pursuant to the terms of the shareholders' agreement (Ct. Exh. 3, pp. 14, 18–19). In fact, Rhoades himself affirmatively represented that the 20 shares listed in the amendment were those lost pursuant to the shareholders' agreement.[28] Indeed, Rhoades characterized the reference to Brookfield as bearing on the issue of damages recoverable in BAC's then pending lawsuit against Rainess seeking damages by reason of BAC's loss of the Brookfield opportunity (Exh. 31, Ct. Exh. 3, pp. 20–21).

The trial of the validity of Bankers' lien continued throughout March 9 and 10. The order confirming BAC's plan was entered on March 12, 1976.

Around the time of confirmation of BAC's plan, meetings were held among Braten, Soifer, Rhoades and Feldesman regarding the ownership of Brookfield (980). However, notwithstanding Braten's testimony at the feasibility hearing that the

**24.** Jaffe testified that after this hearing, he determined any further action would be pointless (1788), in light of this court's position that his objections were groundless, dilatory tactics meant to impede confirmation (1788; Ct. Exh. 3).

**25.** Rhoades points to the following testimony at the March 9 hearing as clearly reflecting his understanding that BAC had a claim to a 100% interest in Brookfield:

"Rhoades—I stated it was my opinion that Braten owned *the stock* of Brookfield ..." (Ct. Exh. 3 at p. 16); and
"There again, it's necessary that the schedules reflect the contention that Braten owned *the stock* of Brookfield, whatever that might be worth. It's a claim which is unliquidated or it is a claim of ownership". (Ct. Exh. 3 at p. 21)

**26.** "Mr. Jaffe: Well, then, there would be a question as to whether it wasn't disclosed in the assets and they brought a lawsuit, as I understand Mr. Rhoades intends to do, to get the stock which is a *half-interest*". (Ct. Exh. 3 at pp. 21 22)

**27.** "Mr. Gitter: Before he goes into that, I deposed Mr. Braten for many hours about Braten's twenty shares of Brookfield's stock, and I

reported to the creditors' committee at the meeting that Braten never, in fact, really owned the shares.

The Court: That's your considered judgment as counsel to the committee?

Mr. Gitter: Right. They were going to go into that particular deal but Mr. Braten was supposed to put up two hundred fifty thousand dollars in order to acquire the shares". (Ct. Exh. 3 at pp. 13–14, accord; pp. 18–19)

**28.** Rhoades testimony was as follows:

"The relevance of putting it in the schedules is very simply this ... [I]f there had been an acquisition of Brookfield and if it had substantial assets, then those assets would be part of the assets of Braten and that would be relevant on the question of solvency and insolvency. There again, it's necessary that the schedules reflect the contention that Braten owned the stock of Brookfield, whatever that might be worth. It's a claim which is unliquidated or it is a claim of ownership.

We elected to put it in as a claim of ownership of an asset. This is all that is involved here and I think Mr. Jaffe should not be raising this issue now. He has had a year and a half to explore this".

question of this ownership was one still to be litigated, Jaffe's recollection was that Rhoades was contemplating a suit against Soifer, and Braten's advice to Gitter that Rhoades was advancing a "crazy idea" about suing Soifer, all four agreed at trial that actual litigation never was contemplated or even suggested (569, 965–66, 975). In fact, the only intimation of any litigation between BAC and Soifer was suggested by Feldesman as a means of justifying Soifer's continuing desire to implement the consolidation originally planned with Braten and BAC (985, 1529).

From early January,[29] Soifer apparently sided with Rhoades and Braten who wanted him to acknowledge that BAC had owned Brookfield from the beginning (985, 1524). Feldesman opposed such an agreement, terming it a "capitulation" (1487–89, 2017), totally at odds with earlier public statements (Exh. 92). Feldesman pressed Soifer to find a valid business purpose, consistent with such an acknowledgement (Exh. 92). Although none was found (1488), Feldesman suggested a "litigation" in which BAC's ownership of Brookfield would have been agreed to in advance, and the stipulation of settlement announced during the lawsuit (1520–24; Exhs. 94, 95). In fact, during this period, the only real dispute between Braten and Soifer was as to the form the consolidation would take.

In August, 1976, Soifer, on a mere handshake with Braten, and before any plans were finalized (968–971), turned the Brookfield stock over to BAC (987, 2300; Exh. 50), acknowledging that BAC had owned Brookfield from its inception (618–19, 983). According to Soifer, both he and Braten suddenly decided "we didn't want any lawyers, we wanted an off the cuff business" (975–77). On August 24, Soifer advised Brookfield's auditors that Brookfield had been owned by BAC since August, 1974 (Exh. 104). It is BAC's position Soifer was merely "settling" his dispute with Braten over the ownership of Brookfield. The

Bank, on the other hand, views this turnover as the consummation of a "secret trust" requiring Soifer to restore Brookfield to BAC after the latter was freed from debt, a liberation achieved by the confirmation of the Chapter XI plan.

Soifer testified in depth as to the facts surrounding his decision to relinquish his Brookfield ownership. According to Soifer, immediately after Braten had called him in Palm Springs, he began thinking about giving in. Feldesman testified that he was trying to convince Soifer not to capitulate from as early as January, 1976 (2017), advising Soifer that his position was impregnable (1971), and that he could easily withstand any litigation. Feldesman characterized Rhoades' theory as "made of whole cloth" (978–80, 1964). However, notwithstanding Soifer's prior confidence in Feldesman's ability to protect his interests, Soifer decided he saw things differently (978), as he felt Brookfield could not withstand litigation, notwithstanding the fact that it was then doing almost $18 million a year in sales, with net profits before taxes of close to $1.5 million a year (Exh. 2), thus making 10% on its sales in an industry in which 3% is considered "great" (593, 617, 622; Exh. 2). Soifer, however, did not explain his reason for viewing a merger with a company just out of Chapter XI as a more attractive alternative (595). According to Soifer: "I decided so long as I had gotten everything I wanted what is the difference to me. So, Braten owns Brookfield" (568).

But, it should be noted, Soifer testified that he was never told the basis of Rhoades' theory supporting Braten's ownership interest (1972). According to Soifer, he met with Braten in July and that Braten "laid out the deal" (983). And, at that meeting, they came to an agreement based on "trust and confidence", as it "made more sense for BAC to own Brookfield" (983). After the meeting, Soifer called Feldesman and told him to go along with BAC's plans (985). In exchange for relinquishing his ownership of

---

**29.** Brookfield's books show that Soifer consulted with accountants for tax advice on a "merger" while he was in Palm Springs. Although

Soifer denied that there was any connection with these discussions and Braten, he had no explanation for the entry (1250; Exh. 72).

an admittedly successful company, Soifer received a simple employment agreement from Brookfield, executed on September 27, 1976 (600–02; Exh. 38), an indemnity on the guarantee Soifer had given to Brookfield's factor (Exh. 44), and the right to buy a 50% interest in a reactivated Brookfield Industries (886),[30] then a shell company (607, 610; Exh. 99). However, at the time Soifer turned over his stock, the terms of this "settlement" were not finalized (968).[31]

Feldesman disclaimed any involvement in Soifer's final arrangements with Braten,[32] although he did remember trying to "reason" with Soifer late in September.[33] However, Soifer stood firm, signing whatever Rhoades prepared for him (1490, 1974, 2304).

In October, 1976, two months after Soifer handed Brookfield over to BAC, Soifer bought 45% of the stock of BAC from Braten at fair market value as at October 31, 1976, as determined by an appraisal to be performed by Shearson Hayden Stone Inc.

(Shearson) (943; Exhs. 39 and MM). Neither Soifer nor Feldesman reviewed any of the material made available to Shearson for this appraisal[34] (2323–24; Exh. 22). Soifer testified he just was not concerned with the price ultimately determined as "he would just leave Brookfield for BAC" if he did not like the price, for he was certain it could not survive without him (805–06, 1083).

Shearson's May 1977 appraisal (Exh. 55), concluded the stock was then worth $475,-000, although the 45% represented a minority interest that could not easily be sold at any price (603, 617; Exh. 55, p. 4). And in July, 1977, Soifer paid Braten, in cash and note, $475,000 for this minority interest in BAC (Exh. 42).

On June 18, 1976 Rhoades served a third verified, amended complaint in the Rainess suit, on behalf of BAC (Exh. 32). Its importance in the context of this controversy is the conspicuous absence of any mention of the lost Brookfield opportunity.[35] Jaffe,

---

**30.** According to Soifer, there was discussion about putting all the stock and/or assets of both BAC and Brookfield into Industries, an arrangement consistent with Soifer's original plans for the structure of Brookfield (535–40). However, Soifer never received a written commitment that this would be done, as he was content to "rely on Milton Braten's word" (Exh. 101, p. 2, ¶ B.2).

**31.** The only written agreement concerning Soifer's turnover of the Brookfield stock was a written agreement between Braten and Rhoades, under which Rhoades held stock in BAC as attorney for Soifer to secure Braten's "commitments" to Soifer (Exh. 45).

**32.** Feldesman did review the employment agreement (989; Exh. 38).

**33.** Feldesman described their conversation as follows: "Feldesman [referring to Brookfield]: If you die what have you left to your wife; you may build up a tremendous equity, or maybe you have, but how about passing it on". He said [Soifer] "that's not what I went into this thing for, . . ."

**34.** The final structure of BAC and its affiliates is as follows:
"Braten owns 100% of the common stock of Brookfield Clothes, Inc. ("Brookfield") which was incorporated in New York in August 1974. By contract dated August 7, 1974, Brookfield, as of August 2, 1974, purchased the assets and

assumed certain of the liabilities and obligations of the Brookfield Clothes Company, a division of Phillips-Van Heusen Corp.
Braten also owns $350,000 principal amount of the preferred stock of Brookfield Industries, Inc. ("Industries") which is a separate company. Fifty percent of the common stock of Industries is owned by Milton Braten and fifty percent is owned by Herman Soifer. Industries in turn owns $950,000 principal amount of Braten's preferred stock. Industries owns the machinery and equipment used by Brookfield and holds the lease to the manufacturing facility occupied by Brookfield. To the best of our knowledge and belief, these are the only relationships among Braten, Brookfield, and Industries" (Exh. 55, p. 1)

**35.** Compare with the following allegations contained in BAC's amended, verified complaint (Exh. 31).
". . .
18. The former Rainess, prior to August 23, 1974, saw . . . (b) a forecast of plaintiff's accounts receivable, to April 1975, combined with figures forecast for the anticipated accounts receivable of a company referred to as 'Brookfield' for the period July 1974 to and including April 1975;
(c) a pro forma balance sheet of said 'Brookfield';
(d) a projection of cash flow of said 'Brookfield' with notations made thereon by defendant Stanley Sachs, hereinafter referred to as

who was out of town in June and July, 1976, received a telephone call from Donald Babb, Esq., counsel to Rainess, in August, that informed him of

"shocking news ... they [BAC] have now turned around ... and instead of saying they lost Brookfield, which is what they said in their complaint that you knew of ... they served a new complaint" (1788–89).

Bankers' position is that this telephone call and Jaffe's subsequent review of the amended complaint, supplied the requisite "knowledge" of fraud required by statute; namely, BAC no longer subscribed to the validity of the shareholders' agreement, a complete reversal of its position throughout its Chapter XI case.

Braten and Soifer acknowledged that the shareholders' agreement was invalid from its inception and that BAC owned Brookfield from 1974, through the date of the confirmation of BAC's Chapter XI. Indeed, Braten admitted that BAC's entire Chapter XI proceeding, by which BAC was discharged of over 85% of its indebtedness, was a "mistake". BAC emerged from the Chapter XI proceeding the owner of a company and its assets worth millions, safe from the claims of BAC's creditors.

### THE FACTS AND THE LAW

By moving to set aside confirmation of BAC's Chapter XI plan, Bankers has the burden of proving each of the elements set forth in Section 386, i.e., (1) that Bankers is a party in interest; (2) that its application was filed within six months of the confirmation; (3) that fraud was practiced in procuring the arrangement, and (4) that knowledge of such fraud came to Bankers since confirmation. See, generally, 9 *Collier on Bankruptcy* (14th ed.) ¶ 11.02. As there is no dispute that Bankers, a substantial if not BAC's largest creditor, is "a party in interest" which filed a timely application, the issues here turn on the third and fourth elements of the statute and whether, on the proof, they have been satisfied.

Section 386 is a narrowly drawn statute reflecting a policy fostering prompt and final disposition of Chapter XI cases. *In re Medical Analytics, Inc.*, 410 F.Supp. 922 (S.D.N.Y.1975); aff'd, 532 F.2d 879 (2d Cir. 1976); *In re Vandeweghe*, 49 F.2d 939 (S.D.N.Y.1931).

Thus, contrary to Bankers' position that confirmation may be revoked in the exercise of a bankruptcy court's general equitable power, analogous to a court's power to set aside a bankrupt's discharge under Section 15 of the Act, 11 U.S.C. § 33, this court is bound by the strictures of Section 386, for it expresses the exclusive means to revoke confirmation of a Chapter XI plan.[36] *In re Klein*, 22 F.2d 906 (2d Cir.

---

'Stanley', then a partner of the former Rainess; and (e) a projection of operations of said 'Brookfield'.

.    .    .    .    .

20. The former Rainess knew from the aforesaid forecast of operations of plaintiff, that plaintiff expected some losses in 1974, and that such losses would be reduced by a proposed merger with the aforesaid 'Brookfield'.

21. The former Rainess, commencing in July 1974, attended meetings with regard to a proposed acquisition of 'Brookfield', and a proposed merger of 'Brookfield' and plaintiff.

.    .    .    .    .

48. By reason of the foregoing, and as a natural and foreseeable consequence thereof,

.    .    .    .    .

(d) a merger between the plaintiff and 'Brookfield' was aborted;

.    .    .    .    .

49. By reason of the foregoing, plaintiff has suffered great damage and loss of income and assets, and expense, generally in the sum of $20,000,000, and specially in the additional sum of $5,000,000, and asks punitive and exemplary damages in the additional sum of $10,-000,000.

Wherefore, plaintiff demands judgment against the defendants and each of them in the sum of $35,000,000 together with the costs and disbursements of the action".

36. Bankers cites *Appeal of Moynagh*, 560 F.2d 1028 (1st Cir. 1977), involving revocation of an individual's discharge under Section 2a(12), 11 U.S.C. § 11a(12), in support of its position that the Bankruptcy Court has "general equity jurisdiction" to set aside a confirmed Chapter XI plan. *Moynagh* was expressly rejected by that same court in *Matter of Newport Harbor Associates*, 589 F.2d 20 (1st Cir. 1978), a case in-

1927); *In re Mirkus*, 289 F. 732 (2d Cir. 1923).

What is clear is that Bankers has the burden of proving "fraud" and that fraud requires actual fraudulent intent. 9 *Collier on Bankruptcy* (14th ed.) ¶ 11.02[3]. But Congress provided no dictionary for the word "fraud" and left it to the development of judicial gloss to guide delineation of types of conduct generally understood to constitute fraud. Such activity includes a "false oath in the schedules as to the assets of the estate", *In re Roukous*, 128 F. 645 (D.C.R.I.1904); and intentional concealment of property, *In re Cashman*, 103 F. 67 (S.D. N.Y.1900).

Based upon this record, Bankers has clearly satisfied its burden of proving that BAC is guilty of both these fraudulent activities. The key to the debtor's fraud is the shareholders' agreement (Exh. 11), by which BAC, under the supervision of Milton Braten, sought to protect its newly acquired interest in Brookfield by "apparently" relinquishing that interest to Soifer but with the understanding that its interest would be restored when the Chapter XI process had cleansed BAC of its indebtedness. This concealment was furthered by false and misleading information supplied to both creditors and the court throughout the Chapter XI proceedings.

BAC contends that Bankers has not sustained its burden and that its case depends on mere suspicion and innuendo. Admittedly, this is a case of much conflicting evidence. But on the material evidence, the court as trier of fact may draw appropriate inferences, make the findings of controlling fact, and apply the law to those facts. These the court now undertakes.

Fraud, by its very nature, is difficult to prove, as it is not readily susceptible of ocular observation. It is, by its nature, covert and surreptitious. Indeed, intent to defraud is rarely the object of direct proof, and must be inferred from the evidence in the case dealing with the transaction in question. The court, upon its review of the evidence, must determine whether the circumstances, when all are taken together, are consistent with an honest intent. 37 Am.Jur.2d, *Fraud and Deceit*, § 4381 (1968); *Connolly v. Gishwiller*, 162 F.2d 428, 433 (7th Cir. 1947); *cert. den.* 332 U.S. 825, 68 S.Ct. 166, 92 L.Ed. 400; *In re McCrea*, 161 F. 246 (2d Cir. 1908).

A threshold factual issue in this case is the time when Exhibit 11, the shareholders' agreement, was drafted. It is Bankers' position that it was not drafted until August 26, 1974, after Bankers had terminated BAC's credit. Although Bankers has not demonstrated that the shareholders' agreement was executed on August 26, it has demonstrated that it was executed after Braten and Soifer knew that BAC and Braten could not possibly supply the $250,000 subordinated loan mandated in paragraph 14(b) of that agreement. Plainly, the real function the shareholders' agreement served was to shield the Brookfield assets from BAC's creditors, a first step in Braten's fraudulent concealment of Brookfield from his company's creditors.

As Bankers' case turns on a scheme of fraud embarked upon when the shareholders' agreement was executed, the date on which it was signed is crucial. The timing can be determined by piecing together the often vague and somewhat inconsistent testimony of Braten, Soifer and Feldesman.

Throughout early negotiations with PVH, Soifer's main concern was to remain free from financial exposure. It is plain that his original inclination was to run the business under a long-term employment agreement. Indeed, Braten was called in to handle financing, and right to the date of closing only BAC's name appeared on all supporting documentation, a period, however, throughout which BAC's financial picture was darkening. However, after months of negotiation, and on the date of closing, Feldesman was brought in by Soifer to negotiate what, by then, appeared to be a completed transaction. Notwithstanding Feldesman's, Soifer's and Braten's testimo-

volving Chapter XI revocation pursuant to Section 386.

ny to the contrary, it is beyond this court's belief that Feldesman came in to "protect" Soifer, a man he had never before represented. And, notwithstanding testimony to the contrary, the structure of the shareholders' agreement itself belies an intention to free Soifer from exposure. Rather, Feldesman was a long time friend of Klineman, then a BAC stockholder. And, it appears that the common leitmotif orchestrating the actions of the singers was the desire to conceal and thereby protect a valuable asset from creditors of an increasingly troubled BAC. The only reasonable explanation for Feldesman's sudden appearance on the scene is his scenario for a plan to protect Brookfield.

The shareholders' agreement was clearly a last minute attempt to save Brookfield from BAC's creditors. The record is clear that through the August 12 closing, Soifer had no interest in Brookfield. After the closing, Braten told Soifer that he could not put the necessary money into Brookfield. And, on August 13, the day Soifer executed the Chase guarantee, he admitted he still had no interest. Feldesman's testimony is akin to that of Soifer's. He testified that he gave Soifer the shareholders' agreement to execute, together with the stock certificates, which he did not even get back from the stationers until August 13. Therefore, it is plain that the shareholders' agreement was drafted sometime between August 13 and August 27, the day it was shown to Jaffe, at a time when Soifer already knew it was impossible for Braten to comply. And, Feldesman admitted it was of a type he could draft overnight, and, indeed, Soifer's testimony as to his understanding of how the shareholders' agreement protected him compels the finding that that agreement served to protect Brookfield at a time of BAC's ever more likely demise. When Soifer was asked how the shareholders' agreement protected him against risk by making him the sole shareholder of Brookfield, he said:

"You are taking me after a fact and pinpointing an incident here that I had. I never thought I would be involved in because my original statement was to

Milton Braten—can you finance this whole thing; and all of a sudden the Bank goes and takes all his money away and I'm standing here in the middle of everything, and then I have to go proceed, and how do you protect the business. That's where I got involved". (995–96).

It taxes the credulity of any reasonable trier of facts to believe that Braten, a CPA, and Soifer, a sophisticated businessman, never discussed "numbers"; indeed, it is more likely they were continuously immersed in such matters, and took what they thought was appropriate action at a time that BAC was tottering.

*Cook v. Ball*, 144 F.2d 423 (7th Cir. 1944), *cert. den.* 323 U.S. 761, 65 S.Ct. 93, 89 L.Ed. 609 (1944), also dealt with efforts to conceal assets from creditors. There, the court was called on to determine whether a partnership owned over 8,000 shares of stock. At a time when this partnership was insolvent, it made an agreement with one Ball to form a corporation and, under that agreement, deposited the shares of stock in escrow. Under the contract, the partners, sophisticated businessmen, agreed to various conditions that were impossible to meet. The appellate court quoted the trial judge, who had asked:

"What, then, was the purpose of placing this provision in the contract, a provision which every one knew could not be complied with? And, the answer was: 'It is clear that it was the intention of the parties to the contract to prevent creditors from acquiring any interest in the 8,250 shares of stock by judgment against the partnership . . . or other legal process' "

144 F.2d at 431–2.

According to Braten and Rhoades, after Rhoades discovered certain information in September, 1975 that caused him to question whether BAC had indeed lost its interest in Brookfield, Rhoades attempted to tell both Jaffe and Gitter of his discovery. Both Gitter and Jaffe deny any such conversation, a denial supported by the record.

Indeed, the record is clear that the only matter Rhoades or Braten ever discussed with either Jaffe or Gitter was Rhoades' contemplated challenge of paragraph 14(b) of the shareholders' agreement as an illegal forfeiture, a challenge that could recoup only the 20 shares generally believed by all to have been all that was lost pursuant to the shareholders' agreement.

Indeed, if it is true that Rhoades had made such a startling discovery, it was incumbent upon the debtor in possession to fully and fairly apprise creditors, (and the court) of such development as "disclosure is the minimum requirement" in bankruptcy. *American United Mutual Life Insurance Co. v. City of Avon Park, Florida,* 311 U.S. 138, 145, 61 S.Ct. 157, 161, 85 L.Ed. 91 (1940); *In re New York Fluorescent Light Co.,* 44 F.Supp. 54 (E.D.N.Y.1942). The record is clear that Braten and Rhoades circulated only selective information that concealed, confused and disclosed only part of the real truth, without any intention of ever informing anyone of BAC's continuing ownership of Brookfield.

And, the circumstances, following confirmation, in which Soifer gave up Brookfield without a fight, and without a *quid pro quo,* insist upon the finding that it had been held by Soifer in trust throughout BAC's Chapter XI proceeding. It stretches the imagination too far to term Soifer's "capitulation" a settlement of litigation. The only explanation of such a turn of events is that Soifer was honoring his original understanding with Braten, to return Brookfield, a first step towards implementing the original plans for Brookfield.

Feldesman and Soifer both admitted that it was always Soifer's intention to reinstate BAC's interest in Brookfield. However, there was a dispute among Rhoades, Braten, Soifer and Feldesman as to the time and form of the reactivation.

A memorandum Feldesman prepared around the time of the "global settlement" negotiations, (Exh. 81), is most illuminating as to his concerns with the intended reactivation. In this memorandum Feldesman sets forth the pros and cons governing the settlement of the litigation with Bankers. Feldesman noted this settlement would enable Braten to "reactivate interest" in X company immediately, while without a settlement there might be a "two year delay" in reactivation.

At the trial, Feldesman admitted that X company referred to Brookfield (1360). Although Feldesman could not explain the somewhat cryptic state of this memorandum, it is obvious that the projected two year delay in reactivation was linked to his concern with the possibility of fraud claims being asserted against Braten (Exh. 81, par. 4).

Although Feldesman always envisioned Brookfield's involvement in BAC's Chapter XI, such as by funding a percentage of the plan, his ideas were consistent with the proposition that Soifer owned Brookfield. However, Soifer persisted in siding with Braten and Rhoades that Brookfield be kept totally free from the claims of BAC's creditors. Against Feldesman's advice, it was decided to wait until after confirmation to "reactivate" his interest, disregarding everything previously said as to Brookfield. After confirmation Feldesman could make no headway and, reluctant at being involved in a course that was contrary to all of the written documents and public statements, including the shareholders' agreement he prepared, left Soifer to sign whatever Rhoades prepared.

Notwithstanding Soifer's attempted testimony that he was settling threatened litigation, his explanation defies logic and common sense. It is impossible to believe that Soifer, a sophisticated and successful man, would simply hand back a company as successful as Brookfield, for an employment agreement and the privilege of purchasing a minority stock interest in BAC at an undetermined fair market value. There is simply no support for Soifer's explanation that he feared the taint of litigation on Brookfield's business as the record is absolutely clear that no litigation was ever contemplated. Moreover, not only was Soifer consistently advised by Feldesman that his position was impregnable, but Feldesman

also testified that the fear of litigation was not a real or valid concern. Indeed, whatever legitimate fear Soifer might have had as to the impairment of Brookfield's credit by reason of a "dispute" with BAC over ownership could hardly be relieved by his relinquishment of his company to one emerging from Chapter XI and involved in various and sundry lawsuits on its own.

This court is satisfied upon this record that fraud was practiced by BAC in the procurement of confirmation of its Chapter XI plan, and makes that ultimate finding.

■ The final hurdle Bankers must jump is the showing that "knowledge" of the fraud it has just proved was not obtained until after confirmation.[37] The purpose of the requirement that knowledge has to come after confirmation is "if the applicant knew of the fraud prior to confirmation, he should have presented it in opposition to confirmation." 9 *Collier on Bankruptcy* (14th ed.) ¶ 11.02[4]. This furthers the desire for finality and repose in Chapter XI proceedings, as it is a cumbersome process, affecting diverse interests, one that strives for debtor rehabilitation. Its goals are fostered by making the time to challenge confirmation a short one.

It is BAC's position that Bankers' case is lost under this requirement, as it had either actual or constructive knowledge of the relevant facts concerning ownership of Brookfield, as well as the relationships of BAC and Braten with Soifer, and had been suspicious of these relationships throughout BAC's sojourn in this court. And, as BAC sees it, Bankers, armed with this knowledge, opted to do nothing to impede confirmation and should now be turned out of court.

It would appear that BAC's position is that Bankers was under a duty to make an investigation, and was obliged to ignore the schedules and Braten's sworn statements. Indeed, BAC now seeks to utilize the fraud it has practiced as a shield.

However, it is clear the investigation revealed exactly what Braten, Soifer and Feldesman intended, *i.e.*, that BAC lost the 20 shares of Brookfield stock by failing to comply with a valid and binding shareholders' agreement. It is plain that Braten, instead of providing honest and forthright information, consciously obfuscated matters, never fully and fairly informed anyone of the true status of Brookfield, and supplied no information to impeach the validity of the shareholders' agreement. Faced with this intentional and carefully orchestrated concealment, it is not clear what further steps Bankers could have taken.

■ It is a *debtor's duty* to set forth its affairs in detail to ensure that those interested in the administration of the estate have completely dependable information on which they can rely and take appropriate action without the need to dig for those facts. *In re New York Fluorescent Light Co., supra*, at 56; *In re Mazzola*, 2 C.B.C.2d 242, 4 B.R. 179 (Bkrtcy.D.Mass.1980). BAC's position would pervert this goal by rewarding a debtor's efforts at blocking information and punishing those that believe sworn statements to be true. This is inconsistent with the policy of the law, and as explained in *In re Roukous*,[38] *supra*, at 645, a dangerous precedent to set.

"A construction which would require a creditor to disregard a bankrupt's oath to his schedule, and to make an independent investigation into the bankrupt's affairs before agreeing to the composition, under penalty of being finally precluded by the

---

**37.** Compare with Section 1144 of the 1978 Bankruptcy Reform Act, 11 U.S.C. § 1144 (Supp.IV), which has deleted this requirement.

**38.** *In re Roukous* dealt with an application to set aside a Section 12 composition, pursuant to Section 13 of the 1898 Bankruptcy Act, 11 U.S.C. § 31, 30 Stat. 550 (U.S.Comp.St.1901). Section 13 was virtually identical to Section 386. It read this way:

"The judge may, upon application of parties in interest filed at any time within six months after a composition has been confirmed, set the same aside and reinstate the case if it shall be made to appear upon a trial that fraud was practiced in the procuring of such composition, and that the knowledge thereof has come to the petitioners since the confirmation of such composition".

confirmation thereof, would be unreasonable. Compositions are ordinarily made with a view to a speedy settlement. It is not a requirement of ordinary diligence that a creditor should assume a bankrupt to be guilty of a false oath, and, upon such assumption, make, in each case, an independent investigation before agreeing to the terms of the composition. Because creditors must ordinarily rely, to a great extent, upon a bankrupt's statement of his affairs in considering the terms of a composition, and because ordinarily they will extend to the bankrupt a presumption of innocence of criminal offense or fraud, there is a practical danger that advantage may be taken of their reliance upon the bankrupt's sworn schedule. This danger would be especially great if the bankrupt had only to procure a confirmation of the composition in order to preclude all further inquiry into the matters enumerated in section 13 as constituting a bar to confirmation. It was doubtless a purpose of section 13 to guard against the danger that a creditor might be induced to agree to a composition through fraudulent statements of the bankrupt as to the condition of his estate; and there is no reason why the inquiry should be closed if the statements were made under oath in a schedule filed in the bankruptcy court. It was the clear purpose of the statute to give a definite period of six months within which a petition might be filed to impeach a composition for fraud, the knowledge whereof came to the petitioner since the confirmation".

Again, in the Spring of 1975, during Feldesman's "global settlement" negotiations, Bankers voiced suspicion that BAC and Brookfield might "unite" after confirmation (Exh. 48). And Feldesman repeatedly informed creditors that Soifer was open to a possible merger. However, it is not unusual for a prosperous company and a company just out of Chapter XI to merge to utilize a valuable tax benefit. However, nothing in the course of these negotiations could even be viewed as giving rise to the suspicion that BAC would ultimately renounce the shareholders' agreement and claim total ownership of Brookfield. Indeed, Feldesman's suggestion that Brookfield somehow acquire BAC was consistent with the validity of the shareholders' agreement. There is simply nothing in these negotiations to even suggest BAC's position that it always owned Brookfield, or Soifer's predisposition to hand Brookfield back to BAC.

Braten and Rhoades testified that they began telling "people" of Rhoades' "startling discovery" in early January, 1976, but, according to Braten, "no one would listen". However, the record is clear nothing of the sort ever was told to either Jaffe or Gitter. In fact, the only place Brookfield's ownership and Rhoades' intention to amend arose was at negotiations with Soifer over the ultimate form the transfer of ownership would take. Although Rhoades testified he knew it was important to inform creditors of his intention to amend, he never explained why Soifer was told of his new theory as early as January, 1976, while Gitter, for the creditors, was not told until March. It is thus reasonable to infer that Braten and Rhoades were only interested in furthering their concealment. The only information selectively disseminated was intended to be a cloak for BAC to protect itself from a claim of fraud on a possible application to revoke confirmation for fraud.

Notwithstanding Braten's testimony to the contrary, it is plain that his January 27, 1976 testimony at BAC's feasibility hearing was intended to further the uniformly held view that BAC had lost its interest in Brookfield in August, 1974. Notwithstanding Rhoades' testimony that he was already preparing to amend BAC's schedules to list Brookfield as an asset, Braten in no way acknowledged this change in position. Indeed, by its very nature, Braten's testimony can only be viewed as calculated to feed on Gitter's and Jaffe's established views as to the loss of Brookfield. Braten's mention of "potential litigation that creditors already investigated" could only have been understood by Jaffe and Gitter as referring to

those matters they had investigated at the outset. Both Gitter and Jaffe, satisfied with the results of the committee's investigations, merely viewed this "litigation" as Braten's attempt to get something out of Soifer, aided by Rhoades' by then well-known propensity to harass by litigation.

BAC also points to the amended schedules prepared by Rhoades and submitted to the court on March 9, 1976, as sufficient to charge Bankers with knowledge of BAC's claim to ownership of Brookfield. However, by the juxtaposition of the amendment, its language and Rhoades' testimony at the March 9 hearing, the court is convinced that far from advising creditors of anything, this amendment only served to further bemuse the creditors. The true purpose of this artfully worded amendment was to supply BAC with just the defense it has indeed raised, i.e., Bankers' "knowledge" of BAC's claim to Brookfield. Braten's and Rhoades' final step in this carefully structured scheme points up the wisdom of this observation made in *Mulligan v. Bailey*, 28 Ga. 507 (1859), that

> "a fraud may be as effectively perpetrated by telling the truth as a falsehood and by calling things their right names as by their wrong".

The amended schedules must be viewed in light of the particular facts of this case, and not with the insight that hindsight affords, i.e., Soifer's capitulation in August.

The application in support of the amendment stated that "At the time of the filing of the schedules herein, Braten Apparel inadvertently omitted *certain unliquidated and contingent claims and counterclaims*". (emphasis added) Annexed to this application were schedules of sundry claims, including the proposed change in Schedule B–2–t—"*Stocks and interest in incorporated and unincorporated companies*":

> 1. *Twenty shares* of common stock of Brookfield Clothes, Inc.—the ownership of these shares is in dispute; no market for this stock exists; no market value has been established; and a statement of book value of the stock indicates a negative book value as of the date of the

commencement of this proceeding". (emphasis added)

A claim to 20 shares of stock simply cannot be stretched to include a claim of full and outright ownership of anything. And, on this record, anyone involved in these proceedings in any meaningful manner could only understand a claim to 20 shares to mean a claim to those shares assumed to have been lost pursuant to the shareholders' agreement; something both Jaffe and Gitter testified they assumed. Indeed, since Rhoades testified he was not then certain as to the actual amount of outstanding Brookfield stock, the only logical explanation for the amendment's claim to "20 shares", is that it is a conscious effort to deceive; a utilization of the knowledge that BAC's claim to "20 shares" would automatically be associated with the lost one-half interest in Brookfield.

Although it is BAC's position that Rhoades' testimony put Bankers on notice that BAC claimed full and complete ownership of Brookfield, this evidence is inconsistent with Rhoades' March 9 testimony, as Rhoades actually reaffirmed Jaffe's and Gitter's perception when he purported to explain the relevance of BAC's amendments as an item of damage in BAC's suit against Rainess. Obviously, Jaffe and Gitter, having negotiated the inclusion of a portion of the proceeds of this suit in the plan, knew it sought damages for the *loss* of Brookfield.

Although Rhoades testified he was then preparing an amendment to the outstanding Rainess complaint, he never advised creditors of his intention. In fact, the third amended complaint was not served until two months after confirmation.

And, it should be noted that at that time Braten and Rhoades were in serious negotiations with Soifer with no suggestion of litigation. Indeed, Soifer had already resolved to hand back Brookfield to Braten pursuant to his original agreement. Apparently, Braten and Rhoades did not think creditors would find this of interest.

The timing of the amendment, its language, and the manner of its presentation

are at odds with the purpose of schedules in a Chapter XI case; *i.e.*, to enable creditors to evaluate assets and to afford dependable signposts for them to consider the promises made in a debtor's plan. Here, the plan was accepted in September, 1975. Rhoades came to his "startling discovery" in October and decided to amend BAC's schedules in January, 1976. However, he had no explanation for the two month delay in forwarding the amended schedules to the court. But, an explanation is unnecessary, as it is plain the schedules were amended solely to afford post-confirmation protection; a defense that BAC could use on the contention that the creditors had knowingly abandoned Brookfield. This amendment did not serve to correct an oversight. Rather it was an attempt to pervert the spirit of the law which aims to relieve only honest debtors from past errors and miscalculations. In *In re Eaton*, 110 F. 731 (N.D.N.Y.1901), a case where the court overruled an objection to discharge due to the absence of fraudulent intent, the court noted the possibility for abuse of the amendment process.

> "*A ruling that a bankrupt may verify false schedules and, upon discovery, avoid the consequence of his act by an amendment, is contrary to the spirit of the law which aims to relieve honest debtors only.* If the law were so construed, a bankrupt runs no risk in making a fraudulent return of his property supported by a false oath, for, if undiscovered, he secures the fruits of his wrongdoing, and if detected, he can still obtain his discharge by amending schedules so as to contain the information which the creditors have unearthed in spite of his efforts at concealment". (emphasis added)

It is plain that Braten conceived of just such a scheme for BAC.

The final point BAC raises as having given "knowledge" to Bankers is Rhoades' testimony at the continued March 10, 1976 trial on the validity of Bankers' lien. At that time, Rhoades offered Brookfield's September, 1974 opening financial statement to show that "prior to August 26, 1974 [Bankers] had been told and knew, number one, that stock had been issued to Braten,

20 shares of Brookfield" (Ct. Exh. 4, p. 50). The court admitted the financial statement on the question of whether Bankers had any knowledge of the possible ownership of that portion of the stock, observing that these were the twenty shares listed in the amendment submitted the day before. Rhoades interjected, "*or all the stock*", and Jaffe's retort was, "we saw the documents on August 27. Whatever the documents are, they speak for themselves".

This unexplained slip of language, in the context of an entire record, is too slim a reed upon which to charge Bankers with knowledge of BAC's claim, and deserves no further discussion.

There are few cases dealing with what constitutes prior knowledge to bar a revocation. However, a reading of those cases requires the conclusion that here there was no such knowledge.

The one case directly on point is *Matter of 20546 Corp.*, 408 F.Supp. 959 (S.D.N.Y. 1976), a case with which this court is intimately aware. In *20546*, U.S. Steel, the moving party, knew before confirmation of virtually all of the facts, including a complicated set of lease assignments. In fact, U.S. Steel, at the first meeting of creditors, voiced its suspicion that the debtor was using its reorganization proceeding to effect a rejection of a lease to release individual guarantors of their liability to U.S. Steel. The bankruptcy court rejected U.S. Steel's objection and confirmed the arrangement. And, upon its timely application to set aside confirmation pursuant to Section 386, the bankruptcy court found that U.S. Steel's prior knowledge barred revocation.

The essence of U.S. Steel's appeal to the district court was that after confirmation, when a state court action was commenced against the guarantors, its suspicions proved to be well founded, as the guarantors' principal defense was the lease rejection effected in Chapter XI.

The district court, in reversing and remanding, noted that by state court discovery the interrelationships between the

parties and their orchestration of the various lease assignments were discovered. The district court took the position that while prior to confirmation U.S. Steel knew of the various assignments and may have been aware of the intent of the debtor to release the guarantors from liability, those facts did not constitute facts of the *particular fraud* upon which U.S. Steel's application was based, *i.e.*, the design by which the guarantors procured their dormant corporation's insolvency, and then its Chapter XI, on the misrepresentation that it was for rehabilitation and for the benefit of its creditors.

A review of the facts of this case indicates it to be far stronger than those controlling *Matter of 20546*. Here, creditors were so totally misled by Braten in that they did not even suspect the "particular fraud" practiced. Although Bankers did suspect that things were awry, after a thorough review of BAC's sworn petition and schedules, the creditors' committee's investigation, Braten's testimony, the feasibility hearing, and BAC's verified complaints, and BAC's amendment, there was no reasonable basis for Bankers to suspect, much less know, that the shareholders' agreement was a sham, or that Soifer was poised to return Brookfield after BAC's confirmation. This court is convinced that neither Bankers, Gitter nor any other creditor knew of the fraudulent concealment of Brookfield, as it was coordinated by Braten and Rhoades through confirmation.

A case relevant on the issue of whether knowledge is obtained after confirmation, and whether creditors should have learned of the fraud, is *Keeble v. Sulmeyer*, 290 F.2d 127 (9th Cir. 1961), a case involving an application to revoke a discharge under Section 15 of the Act, 11 U.S.C. § 33, on the ground of fraud discovered after discharge. In *Keeble* the petition listed a small equity in property subject to a mortgage given to the debtor's brother in 1957. The statement of affairs stated that there were no transfers outside the ordinary course of business in the preceding year. After the bankrupt's discharge, the trustee moved to revoke it. At the hearing, it was stipulated that the "1957" mortgage and note were on forms printed for the first time in 1958, a fact the trustee could have learned before discharge.

The court upheld revocation based upon the debtor's repeated statements as to the validity of the mortgage in his schedules and testimony. The court drew the inference that these false statements were made by the debtor in the hope or belief that the trustee would not scrutinize the transaction in detail and that thereby he would be misled into forgoing a detailed examination into the circumstances surrounding the execution and delivery of such a mortgage.

Here, too, BAC's original verified petition and schedules, Braten's testimony, Feldesman's meeting with Gitter, and the amended schedules, all pointed to the validity of the shareholders' agreement. And, unlike *Keeble*, where that trustee could have discovered that the mortgage and note were on forms not yet printed in 1957, here BAC's creditors could not learn of the fraud until it was made public after confirmation.

As it is clear that neither Bankers, nor any other creditor, knew of the fraud proved at the trial, the March 12, 1976 order confirming BAC's plan is vacated and the confirmation is revoked.

While Rule 11-41(1), 415 U.S. 1031, 94 S.Ct. 3253, 39 L.Ed.2d XLIX, would support conversion of BAC's Chapter XI to a bankruptcy under Rule 11-42(b), 415 U.S. 1032, 94 S.Ct. 3253, 39 L.Ed.2d XLIX, a reward the debtor richly deserves, still other considerations are relevant, including what is better for the creditors. See, Advisory Committee Note to Rule 11-41 printed, *inter alia*, in 1979 Collier Pamphlet Edition, Part 2—The Bankruptcy Rules at 640.

Here the court feels that BAC should now offer a plan which is realistic to the creditors in light of the fact that the debtor owns a valuable asset—Brookfield. If this is not acceptable to the creditors, they can refuse to accept a new proposal and, there-

by, insist on BAC's liquidation as the last sentence of Rule 11–41(2) requires.[39]

Submit order.

---

**39.** Where a modified plan is offered after revocation of a plan tainted by fraud, Rule 11–41(2) insists that the steps toward confirmation of the modified plan follow the procedural scheme of Chapter XI for an original plan. Thus, acceptance by creditors must be had as a prelude to confirmation. See, Rule 11–39, 415 U.S. 1029, 94 S.Ct. 3252, 39 L.Ed.2d XLVIII.